[No. 83690-6. En Banc.]
Argued October 27, 2011. Decided March 29, 2012.

ELCON CONSTRUCTION, INC., *Petitioner*, v. EASTERN WASHINGTON
UNIVERSITY, *Respondent*.

158

*Kevin W. Roberts*, *Robert A. Dunn*, and *Michael R. Tucker* (of *Dunn & Black PS*), for petitioner.

*Robert M. McKenna, Attorney General, Jarold P. Cartwright* and *Catherine Hendricks, Senior Counsel,* and *Carl P. Warring, Assistant,* for respondent.

*Stewart A. Estes, Daniel J. Gunter,* and *Shata L. Stucky* on behalf of Washington Defense Trial Lawyers, amicus curiae.

*Robert H. Crick Jr.* on behalf of Inland Northwest Chapter of the Associated General Contractors, Associated General Contractors Oregon-Columbia Chapter, and Associated General Contractors of Washington, amici curiae.

¶1 C. JOHNSON, J. — This case involves a claim for damages relating to a drilling contract between petitioner Elcon Construction and respondent Eastern Washington University. In the suit, tort and contract claims were alleged by Elcon. The contract claims were resolved by arbitration. In dismissing the tort claims, the trial court applied the independent duty rule, formerly known as the economic loss rule, which the Court of Appeals similarly applied in affirming.[1] We hold the economic loss rule has no application under the facts of this case but affirm the Court of Appeals on different grounds.

## FACTS

¶2 Eastern relies on two on-campus wells for its water supply (wells 1 and 2), both of which draw from what is called the Wanapum Aquifer. Beginning in 1987, Eastern requested approval from the Department of Ecology (DOE)

---

[1] This case was deferred pending *Eastwood v. Horse Harbor Foundation, Inc.,* 170 Wn.2d 380, 241 P.3d 1256 (2010) (plurality opinion), and review was granted after *Eastwood* was filed. *Elcon Constr., Inc. v. E. Wash. Univ.,* 170 Wn.2d 1028, 249 P.3d 182 (2011).

to consolidate its water rights. In 2003, the DOE approved Eastern's request, thereby allowing Eastern to "refurbish" its two existing on-campus wells to increase their individual yields.[2] Under DOE rules, refurbishment could include drilling replacement wells in close proximity to the existing wells. Eastern decided to drill replacement wells near wells 1 and 2 and began accepting bids for the job. Eastern's "Instructions to Bidders" contained an "Examination of Site and Conditions" section, which stated in relevant part that by submission of a proposal, the bidder acknowledges:

1. That it has taken steps reasonably necessary to ascertain the nature and location of the Work, and that it has investigated and satisfied itself as to the general and local conditions which can affect the Work or its cost, including . . . (d) the conformation and conditions of the ground; and (e) the character of equipment and facilities needed preliminary to and during the performance of the Work.

2. That it has satisfied itself as to the character, quality and quantity of surface and subsurface materials or obstacles to be encountered insofar as this information is reasonably ascertainable from an inspection of the site, including all exploratory work done by Owner . . . .

. . . .

D. No statement made by any officer, agent, or employee of the Owner or [Architect/Engineer] in relation to the physical conditions pertaining to the site of the work will be binding on the Owner or [Architect/Engineer].

Clerk's Papers (CP) at 1113-14. Prior to bidding, Elcon contacted Eastern and requested all the information it had about the project, about other wells in the area, or about the

---

[2] Without consolidation, Eastern was permitted to pump 750 gallons per minute (GPM) from well 2 and 150 GPM from well 1, for total production of 900 GPM. With consolidation, Eastern is permitted to produce the total 900 GPM from either well, giving Eastern the flexibility to attain total production from one well should problems arise with the other. The drilling contract with Elcon concerned "refurbishing" the wells to make each capable of producing 900 GPM.

geology relating to wells in the area of the drill site. Three years earlier, in 2000, Eastern had hired Varela & Associates to conduct a water capacity study, seeking to identify future options for expanding its water supply. Varela, in turn, hired Golder Associates to perform a hydrogeological investigation. The "Golder Report," based primarily on published reports and selected drillers' logs obtained from the DOE, contained information about the regional hydrology and recommended future wells be drilled into the Grande Ronde Aquifer below the Wanapum Aquifer at a depth of between 700 to 1,500 feet. CP at 338, 340. Per Elcon's request, Eastern provided Elcon a well log for well 2 and a video of well 1 but did not provide the Golder Report. CP at 864. Elcon submitted the low bid ($1,516,635) and was awarded the contract. CP at 1106-07.

¶3 The contract required Elcon to drill two replacement wells to an "estimated" depth of 750 feet.[3] CP at 357. The contract specified that "[s]hould water of sufficient quantity and quality be encountered at lesser depths, drilling may be stopped by the Owner. Likewise, the Owner may direct the depth to be increased in order to obtain sufficient water." CP at 357. In addition, the "General Provisions" of the contract placed a duty on Elcon to investigate the site and subsurface conditions. CP at 1123-24. Elcon delegated this duty to its subcontractor, Intermountain Drilling. Outside of requesting information from Eastern and looking at several DOE well logs on-line, Intermountain Drilling did not conduct an independent investigation. CP at 1211-12.

¶4 In July 2003, work started on replacement well 1. Drilling stopped soon after it started, however, when an unforeseen layer of sand disrupted the work. Then, upon learning that it may have to drill significantly deeper than 750 feet, Elcon insisted upon payment for increased costs. Eastern terminated the contract for convenience instead

---

[3] The depths of preexisting wells 1 and 2 are 512 feet and 561 feet, respectively. CP at 327.

and solicited a final pay request, which Elcon submitted to Eastern on June 4, 2004.

¶5 Upon learning of previously unknown damage to replacement well 1, Eastern issued a termination for cause letter on October 22, 2004, a copy of which was sent to Elcon's bond surety. Elcon filed this lawsuit claiming breach of contract, in addition to various tort claims.[4] The trial court, interpreting the contract's arbitration provisions, submitted all contract claims to arbitration and stayed Elcon's tort claims pending completion of arbitration.[5] CP at 211-13.

¶6 In December 2005, the arbitrator awarded Elcon $1,837,000 ($891,000 in addition to $946,000 Eastern had previously paid for work performed) and denied Elcon's postaward motion for statutory interest. CP at 1132-33. Following arbitration, Elcon pursued its tort claims against Eastern, which included fraud in the inducement for not providing the Golder Report and interference with a business relationship for sending a copy of the termination for cause letter to Elcon's surety. The trial court granted summary judgment dismissing Elcon's fraud and intentional interference claims, finding the intentional interference claim factually insufficient and the fraud claims

---

[4] Elcon's original complaint listed only contract claims. Its amended complaint, however, listed negligent misrepresentation, fraud, defamation, tortious interference with a contractual relationship, publication in a false light, and violation of civil rights. CP at 3-33.

[5] The arbitration clause in Eastern and Elcon's contract provided, "All claims arising out of the Work shall be resolved by arbitration. The judgment upon the arbitration award may be entered, or review of the award may occur, in the superior court having jurisdiction thereof. No independent legal action relating to or arising from the Work shall be maintained." CP at 93. The trial judge stated:

I am of the opinion that a fair and reasonable interpretation of this contract provides that all contract claims are subject to the arbitration provision . . . . However, [Elcon's] claims list a number of actions in tort . . . . I am satisfied that the economic loss rule does not bar claims based in tort that are independent from the breach of contract claims.

CP at 211-12.

164

barred by the economic loss rule.[6] Relying on *Alejandre v. Bull*, 159 Wn.2d 674, 153 P.3d 864 (2007), the Court of Appeals affirmed, holding all Elcon's tort claims barred by the economic loss rule.

## ISSUES

¶7 1. Whether summary judgment was appropriate with respect to Elcon's fraud in the inducement claim.

¶8 2. Whether summary judgment was appropriate with respect to Elcon's intentional interference with a contractual relationship claim.

¶9 3. Whether Elcon is entitled to statutory interest on its arbitration award.

## STANDARD OF REVIEW

¶10 We review summary judgment orders de novo and perform the same inquiry as the trial court, viewing all facts and reasonable inferences in the light most favorable to the nonmoving party. *Hisle v. Todd Pac. Shipyards Corp.*, 151 Wn.2d 853, 860, 93 P.3d 108 (2004) (citing *Kruse v. Hemp*, 121 Wn.2d 715, 722, 853 P.2d 1373 (1993)). The grant of summary judgment is appropriate where there is "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." CR 56(c). "A material fact is one that affects the outcome of the litigation." *Owen v. Burlington N. Santa Fe R.R.*, 153 Wn.2d 780, 789, 108 P.3d 1220 (2005) (citing *Hisle*, 151 Wn.2d at

---

[6] Eastern first moved for summary judgment when the case was assigned to Judge Rielly. Judge Rielly dismissed Elcon's tortious interference, defamation, and 42 U.S.C. § 1983 claims as factually insufficient but denied summary judgment regarding Elcon's fraud and false light claims, finding Elcon raised genuine issues of material fact and determining the claims were not barred by the economic loss rule under the Court of Appeals' *Alejandre v. Bull* decision, 123 Wn. App. 611, 98 P.3d 844 (2004). CP at 1017-20. The case was then transferred to Judge Sypolt, who granted summary judgment on Elcon's remaining tort claims, determining they *were* barred under our *Alejandre* decision, 159 Wn.2d 674, 153 P.3d 864 (2007), which overruled the Court of Appeals. CP at 1379-81.

861). Where no dispute as to the material facts exists, summary judgment is proper.

¶11 The trial court and the Court of Appeals applied the independent duty doctrine, formerly referred to as the economic loss rule, to dismiss Elcon's tort claims. This was a misapplication of the doctrine, though an inconsequential one. Because Elcon's tort claims factually fail, we affirm the Court of Appeals regardless.

¶12 The independent duty doctrine is "an analytical tool used by the court to maintain the boundary between torts and contract." *Eastwood v. Horse Harbor Found., Inc.*, 170 Wn.2d 380, 416, 241 P.3d 1256 (2010) (plurality opinion) (Chambers, J., concurring). In *Eastwood*, we adopted the term "independent duty doctrine" because it more accurately captured the principle behind the rule: "An injury," we held, "is remediable in tort if it traces back to the breach of a tort duty arising independently of the terms of the contract." *Eastwood*, 170 Wn.2d at 389. To date, we have applied the doctrine to a narrow class of cases, primarily limiting its application to claims arising out of construction on real property and real property sales. "We have done so in each case based upon policy considerations unique to those industries. We have never applied the doctrine as a rule of general application outside of these limited circumstances." *Eastwood*, 170 Wn.2d at 416 (Chambers, J., concurring). Indeed, in *Eastwood* we directed lower courts not to apply the doctrine to tort remedies "unless and until this court has, based upon considerations of common sense, justice, policy and precedent, decided otherwise." *Eastwood*, 170 Wn.2d at 417 (Chambers, J., concurring).

¶13 We have not applied the independent duty doctrine to bar a claim for fraud, and we see no basis to utilize it in this case. Even in the real property context, where we have been the least hesitant to apply the doctrine, we have

repeatedly recognized a fraud claim to be outside the doctrine's scope, allowing such claims to be decided based on established tort precedent. *See Alejandre*, 159 Wn.2d at 689-90; *Atherton Condo. Apartment-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co.*, 115 Wn.2d 506, 523-27, 799 P.2d 250 (1990). We find no compelling reason, whether based on common sense, justice, policy, or precedent, to bar Elcon's fraud or tortious interference claim under the independent duty doctrine. The doctrine simply does not apply under these circumstances.

### 1. *Fraudulent Inducement*

 ¶14 The trial court and the Court of Appeals also determined that Elcon's fraud in the inducement claim was factually insufficient. We agree. There are nine essential elements of fraud, all of which must be established by clear, cogent, and convincing evidence: (1) a representation of existing fact, (2) its materiality, (3) its falsity, (4) the speaker's knowledge of its falsity, (5) the speaker's intent that it be acted upon by the person to whom it is made, (6) ignorance of its falsity on the part of the person to whom the representation is addressed, (7) the latter's reliance on the truth of the representation, (8) the right to rely upon it, and (9) consequent damage. *Williams v. Joslin*, 65 Wn.2d 696, 697, 399 P.2d 308 (1965) (citing *Michielli v. U.S. Mortg. Co.*, 58 Wn.2d 221, 361 P.2d 758 (1961)). Elcon claims that Eastern misrepresented the necessary depth of the replacement wells and its knowledge of subsurface conditions by failing to produce the Golder Report. This misrepresentation, it claims, induced it to bid the job and contract with Eastern, thereby causing it injury. This argument ignores the contract's bidding instructions and the character of the Golder Report.

¶15 The trial court and the Court of Appeals determined the Golder Report was not relevant to the refurbishment project. We agree. Importantly, the report was not prepared for the project, having been commissioned three years

before the DOE authorized Eastern's consolidation. Moreover, it recommended drilling future wells in an area geographically separate from wells 1 and 2. CP at 338-40. When asked whether there was a hydrology report for *this* project, Eastern replied there was not. CP at 673. Based on the character of the Golder Report, this was not a false statement.

¶16 The trial court also found that the bidding instructions required Elcon to take steps reasonably necessary to ascertain the nature and location of the drilling, including the conformation and conditions of the ground, and the character of equipment needed for the performance of the work. CP at 1380. Yet, despite this requirement, Elcon did little more than request all of Eastern's available information. CP at 1211-12. The instructions further notified bidders that "[n]o statement made by any officer, agent, or employee of the Owner or [Architect/Engineer] in relation to the physical conditions pertaining to the site of the work will be binding on the Owner or [Architect/Engineer]." CP at 1114. Thus, even with the Golder Report in hand, Elcon still would have been required to conduct its own reasonable investigation. The trial court determined that Elcon failed to do so. CP at 1380. We agree.

¶17 The Golder Report was not relevant to Elcon's contractual duty to investigate under the bidding instructions. Evidence of Elcon's justifiable and reasonable reliance on the information provided by Eastern is therefore lacking. And since the report did not contain information or data of specific relevance to the drill site, not providing the report had no impact on the bidding process.[7] Based on the character of the Golder Report, nondisclosure of the report did not, in this case, constitute a material misrepresenta-

---

[7] While the Golder Report discussed preexisting wells 1 and 2—the wells closest to the drill site—the information regarding the wells was based entirely on the well log for well 2, which Elcon possessed. Otherwise, the report discussed other area wells that, according to Intermountain Drilling's Glen Frachiseur, were not near enough to the campus to be of interest to Elcon. CP at 316-46, 1212.

tion. As such, there are no genuine issues of material fact and summary judgment was appropriate.

¶18 Despite the trial court and the Court of Appeals' reliance on the independent duty doctrine, we conclude the doctrine is irrelevant to the above analysis. In so concluding, we note this is a tort case unrelated to real property. Under these circumstances, the independent duty doctrine does not apply.

2. *Intentional Interference*

■■ ¶19 Elcon argues Eastern intentionally interfered with its contractual relationship by sending a copy of the termination for cause letter to Elcon's surety. According to Elcon, the letter impaired its bonding capacity, causing it injury. The trial court determined Elcon's intentional interference claim was factually insufficient. We agree. A claim of intentional interference requires (1) the existence of a valid contractual relationship of which the defendant has knowledge, (2) intentional interference with an improper motive or by improper means that causes breach or termination of the contractual relationship, and (3) resultant damage. *Cornish Coll. of Arts v. 1000 Virginia Ltd. P'ship*, 158 Wn. App. 203, 225, 242 P.3d 1 (2010) (citing *Leingang v. Pierce County Med. Bureau, Inc.*, 131 Wn.2d 133, 157, 930 P.2d 288 (1997)), *review denied*, 171 Wn.2d 1014, 249 P.3d 1029 (2011). Exercising one's legal interest in good faith is not improper interference.

■ ¶20 Eastern acted on information disclosed prior to the dispute and converted the termination for convenience to a termination for cause. In May 2004, Eastern received a high-resolution video of the work performed by Elcon on replacement well 1. According to Eastern, review of the video revealed previously unknown damage that, after consultation with Eastern's engineering consultant, was determined to be caused by Elcon's nonconforming work. CP at 1099. Once such a determination was made, Eastern converted the termination to one "for cause." CP at 852-53.

Believing Elcon may owe decommissioning costs, Eastern had an interest in notifying Elcon's bond surety of Eastern's potential claim. That the arbitrator ultimately ruled Eastern could not convert to a termination for cause does not somehow make Eastern's interest illegitimate.

¶21 More importantly, by itself, the letter does not show improper purpose. And Elcon, by merely labeling the letter as "intentional and vindictive," has not met its burden of showing such a purpose. CP at 815-16. If Eastern was motivated by greed, retaliation, or hostility in sending a copy of the termination letter to Elcon's surety, Elcon has failed to show such a motive. Conclusory statements and speculation will not preclude a grant of summary judgment. *Greenhalgh v. Dep't of Corr.*, 160 Wn. App. 706, 714, 248 P.3d 150 (2011) (citing *Grimwood v. Univ. of Puget Sound, Inc.*, 110 Wn.2d 355, 360, 753 P.2d 517 (1988)). Elcon claimed to have suffered damage as a result of its surety having knowledge of Eastern's attempted conversion,[8] but absent a showing that Eastern acted with an improper purpose, no genuine issues of material fact exist. Once the moving party meets its burden of showing there is no genuine issue of material fact, the nonmoving party must set forth specific facts rebutting the moving party's contentions. *Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 13, 721 P.2d 1 (1986) (citing *Dwinell's Cent. Neon v. Cosmopolitan*

---

[8] In support of its allegation that it suffered actual, present damage, Elcon submitted evidence of an e-mail from Walter Weller, vice-president of Marsh Advantage America, Elcon's bond surety, to Brook Ellingwood, Elcon's president. The e-mail stated:

Although you submitted your request with adequate time for the bonding company to review, the approval was delayed due to the number of underwriters involved because of the unknown exposure that exists at [Eastern] on the Wells project. . . . The bond is approved on the condition that you limit your future bids to quick turn-around jobs such as this (90 days) until the pending issues at [Eastern] become more clear.

CP at 1253. Judge Rielly ruled the e-mail was inadmissible hearsay and dismissed the claim on summary judgment. CP at 1018. On appeal, Elcon argued the e-mail was an admissible business record. The Court of Appeals did not address the issue, holding all Elcon's tort claims barred by the economic loss rule. Because Elcon's tortious interference claim fails on the improper purpose element, we do not address the admissibility of the above e-mail.

*Chinook Hotel,* 21 Wn. App. 929, 587 P.2d 191 (1978)). Elcon has failed to do so here. Summary judgment was therefore appropriate.

### 3. *Statutory Interest*

¶22 Elcon argues entitlement to statutory interest on the arbitrator's award under RCW 39.76.011, which requires public bodies to pay interest whenever they fail to make "timely payment" on amounts due on written contracts for public works. Payment is considered untimely if it is not made within 30 days of receipt of a "properly completed invoice or receipt of goods or services." RCW 39.76-.011(2)(a). Rather than requesting statutory interest at arbitration, Elcon requested the interest in a postaward motion. CP at 404-05. The arbitrator denied the motion, determining he lacked postfinal award jurisdiction to address the issue pursuant to the arbitration statutes. CP at 387. The trial court determined it did not have jurisdiction to award interest on the arbitrator's award. CP at 1019. We agree.

¶23 In *Westmark Properties,* the Court of Appeals held that adding prejudgment interest to an arbitration award was error on the part of the trial court: "[The trial court] has no basis for determining whether the amount awarded met the test for prejudgment interest; this was part of the merits of the controversy, forbidden territory for a court." *Westmark Props., Inc. v. McGuire,* 53 Wn. App. 400, 404, 766 P.2d 1146 (1989) (citing *Sch. Dist. No. 5 v. Sage,* 13 Wash. 352, 43 P. 341 (1896)). Similarly, in *Fluor Daniel, Inc.,* we noted that the majority of courts considering this issue have found that adding prejudgment interest is an inappropriate modification of the arbitrator's award. In this case, the trial court appropriately limited its review. *Dep't of Corr. v. Fluor Daniel, Inc.,* 160 Wn.2d 786, 792, 161

P.3d 372 (2007). Elcon may not recover statutory interest on the arbitrator's award through a postaward motion.[9]

## ATTORNEY FEES

 ¶24 Both Elcon and Eastern request attorney fees under RAP 18.1. However, neither cites "applicable law" warranting such an award. We therefore deny both parties' RAP 18.1 request. Elcon also requests fees under RCW 39.76.040, which provides, "In any action brought to collect interest due under this chapter, the prevailing party is entitled to an award of reasonable attorney fees." Because Elcon does not prevail on its statutory interest claim, we deny its request.

## CONCLUSION

¶25 The trial court and Court of Appeals misapplied the independent duty doctrine to bar Elcon's tort claims in this case. Regardless, Elcon's claims factually fail. Viewing all facts and reasonable inferences in the light most favorable to Elcon, no genuine issues of material fact exist with respect to Elcon's fraud in the inducement or tortious interference claims. And based on *Westmark Properties* and *Fluor Daniel,*

---

[9] In addition, the statute does not apply to claims subject to a good faith dispute, provided notice of the dispute is given before timely payment is due. RCW 39.76.020. And here, Eastern disputed the amount of Elcon's claim. Pursuant to part 8 of Eastern and Elcon's contract (Claims and Dispute Resolution), Eastern notified Elcon of its intent to conduct an audit of Elcon's pay request. A pay request pursuant to the contract would not be deemed a "properly completed invoice or receipt" for RCW 39.76.011 purposes until such an audit was complete. Eastern, however, did not receive all of the contractually mandated documents necessary to complete the audit until September 23, 2004. CP at 852-53. Thus, when Eastern converted its termination to one for cause on October 22, 2004, it did so within RCW 39.76.011's 30 day requirement. After conversion, Eastern disputed the pay request, and Elcon has not shown Eastern lacked good faith in doing so. Based on these facts, the good faith dispute exception to RCW 39.76.011 applies.

*Inc.,* Elcon is not entitled to statutory interest. We therefore affirm on different grounds.

CHAMBERS, OWENS, FAIRHURST, J.M. JOHNSON, and STEPHENS, JJ., and ALEXANDER, J. PRO TEM., concur.

¶26 MADSEN, C.J. (concurring) — We took review of this case to address the issue whether the plaintiff is restricted to contract remedies or may also assert tort claims. I agree with the majority that we need not reach this issue because each of the tort claims asserted by Elcon Construction Inc. fails for want of sufficient evidence of an essential element of the claim. This being the case, the majority should refrain from any discussion of the so-called "independent duty rule" because it has no bearing on the disposition of this case. We should, in this case, follow the same principle we have often applied, that is, we should decline to address issues where it is unnecessary to do so. *See e.g., Wash. State Farm Bureau Fed'n v. Gregoire,* 162 Wn.2d 284, 297 n.20, 174 P.3d 1142 (2007); *Alejandre v. Bull,* 159 Wn.2d 674, 690 n.6, 153 P.3d 864 (2007); *In re Marriage of Langham,* 153 Wn.2d 553, 569, 106 P.3d 212 (2005).

¶27 The wisdom of doing so is demonstrated by the majority's mistaken statement that the "independent duty rule" was formerly known as the "economic loss rule," as if the two are and have been the same. Majority at 160. This is not the case, and it will only add to the confusion engendered by this new rule. The economic loss rule is unlike the "independent duty rule" that has been described in recent opinions. *E.g., Affiliated FM Ins. Co. v. LTK Consulting Servs., Inc.,* 170 Wn.2d 442, 243 P.3d 521 (2010) (plurality opinion); *Eastwood v. Horse Harbor Found., Inc.,* 170 Wn.2d 380, 241 P.3d 1256 (2010) (plurality opinion). The economic loss rule defaults to *contract* remedies where both are available. The "independent duty rule" defaults to *tort* remedies.

¶28 The economic loss rule rests on the principle that contracting parties should be limited to their contract remedies when loss potentially implicates both tort and contract relief. It is a "device used to classify damages for which a remedy in tort or contract is deemed permissible, but are more properly remediable only in contract. . . . '[E]conomic loss describes those damages falling on the contract side of "the line between tort and contract".'" *Berschauer/Phillips Constr. Co. v. Seattle Sch. Dist. No. 1*, 124 Wn.2d 816, 822, 881 P.2d 986 (1994) (quoting *Wash. Water Power Co. v. Graybar Elec. Co.*, 112 Wn.2d 847, 861 n.10, 774 P.2d 1199, 779 P.2d 697 (1989) (quoting *Pa. Glass Sand Corp. v. Caterpillar Tractor Co.*, 652 F.2d 1165, 1173 (3d Cir. 1981))).

¶29 Thus, the economic loss rule presumes that both contract and tort remedies may be available, and then the rule is used to help determine whether the loss is the type that is remedial under the terms of the parties' written agreement.

¶30 However, according to the majority's dicta in this case (it has nothing to do with the disposition of the case), the policy considerations used to determine whether an independent tort duty exists are considerations of common sense, justice, policy, and precedent. Majority at 165; *see Affiliated FM*, 170 Wn.2d at 449-50 (plurality) (also including "logic"); *Eastwood*, 170 Wn.2d at 389 (plurality) (also including "logic").[10] These are exactly the same considerations that are *always* used to determine whether a tort duty is owed or liability attaches (the court has long recognized the interconnectedness of legal causation and duty). *See, e.g.*, *Simonetta v. Viad Corp.*, 165 Wn.2d 341, 349, 197 P.3d 127 (2008) (whether a duty of ordinary care to warn of hazards involved in use of a manufacturer's product

---

[10] The majority cites to a concurrence for its description of the "independent duty rule." Majority at 165. If the rule did not garner a majority of the court in prior decisions of this court, those decisions have no precedential value. If it did, then more is needed in the way of citation to show that the rule represents the conclusion of a majority of this court.

"depends on mixed considerations of logic, common sense, justice, policy, and precedent"); *Christensen v. Royal Sch. Dist. No. 160*, 156 Wn.2d 62, 66-67, 124 P.3d 283 (2005) (where negligence claim is concerned, "existence of a legal duty is a question of law and ' "depends on mixed considerations of 'logic, common sense, justice, policy, and precedent' " ' " (quoting *Snyder v. Med. Serv. Corp. of E. Wash.*, 145 Wn.2d 233, 243, 35 P.3d 1158 (2001) (quoting *Lords v. N. Auto. Corp.*, 75 Wn. App. 589, 596, 881 P.2d 256 (1994) (quoting *Hartley v. State*, 103 Wn.2d 768, 779, 698 P.2d 77 (1985))))); *Stalter v. State*, 151 Wn.2d 148, 155, 86 P.3d 1159 (2004) (same); *Halverson v. Skagit County*, 139 Wn.2d 1, 8, 983 P.2d 643 (1999) (whether legal liability attaches to acts is a policy question for the court and is determined based upon " 'mixed considerations of logic, common sense, justice, policy, and precedent' " (quoting *Phillips v. King County*, 136 Wn.2d 946, 965, 968 P.2d 871 (1998))); *Hartley*, 103 Wn.2d at 779-80 (same, and noting that "the question of 'whether liability should attach is essentially another aspect of the policy decision which we confronted in deciding whether the duty exists' " (quoting *Harbeson v. Parke-Davis, Inc.*, 98 Wn.2d 460, 476, 656 P.2d 483 (1983))).

¶31 The analysis to determine whether the independent duty exists is no different from the analysis used in any case to decide whether a tort duty exists. There is nothing that analytically differentiates the situation from any other case where a contracting party argues that a tort claim may be brought. Therefore, although the "independent duty rule" is described as a tool used to preserve the boundary between torts and contract, majority at 165, it does no such thing. Nothing about the rule preserves the value of agreement to the remedies that will exist if the contract is breached.

¶32 Rather, this rule appears to mean that if a tort duty is cognizable in the circumstances, the tort claim will be allowed. *See id.* The "independent duty" theory is not an effective tool to determine whether a party will be re-

stricted to agreed-upon contract remedies in the event both contract and tort remedies are available because under the "independent duty rule" once a tort duty is recognized, the party can assert the tort claim. Indeed, the "independent duty rule" does not ask what limitations on remedy are imposed or contemplated by the contract.

¶33 All that is required for a contracting party to completely bypass the contract remedies for which the parties expressly bargained is that the court acknowledge that a tort claim in fact exists. Since the whole point of the exercise, ostensibly, is to provide a framework for deciding when a party may assert a tort claim despite existence of contract remedies, the analysis simply ends with the recognition that the tort remedies potentially exist.

¶34 Unlike the economic loss rule, which is designed to determine when a party should be held to agreed-upon remedies, the "independent duty rule" is not defined in a way that provides an effective tool for this determination. I continue to believe that the new "independent duty rule" is not reasonably grounded or defined. See Affiliated FM, 170 Wn.2d at 463-75) (Madsen, C.J., concurring/dissenting). Rather than attempting to explain this new rule in this case, where it unquestionably does not apply, I would wait for a case that actually presents the issue. Perhaps when this court applies the "independent duty rule" it will make sense. In the abstract it does not.

¶35 I am concerned, too, that the majority refers to the decisions of the trial court and the Court of Appeals as if they had employed the "independent duty rule." Both of the courts' rulings predate the unanticipated appearance of the "independent duty rule," and these courts actually decided this case under the economic loss rule. This blurring of historical fact is apt to add to the confusion about the new rule.

¶36 In conclusion, although I agree with the majority that the tort claims would fail in this case in any event, I

believe it is a mistake to discuss the "independent duty rule." I concur in the result.

WIGGINS, J., concurs with MADSEN, C.J.