# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| JOHN and DARCEE JOHNSTON, a married couple, | ) ) ) | No. 70719-1-I |
| Respondents, | ) ) ) | DIVISION ONE |
| v. | ) ) | |
| PETE TORKILD, JULIA TORKILD, individually, and the marital community composed thereof, and FIRST CAPITAL INC., a Washington Corporation, | ) ) ) ) ) ) ) | |
| Appellants, | ) ) | |
| TOP MORTGAGE CORPORATION, A Washington corporation and SIHA TOP, individually, TORKILD CORPORATION, a Washington Corporation, MAIN STREET MORTGAGE COMPANY INC., a Washington Corporation, MAIN STREET REALTY, INC., a Washington Corporation, AVANTI INTERNATIONAL HOLDINGS, LLC, a Delaware Series Limited Liability Company, | ) ) ) ) ) ) ) ) ) ) ) ) ) | UNPUBLISHED OPINION

FILED: April 27, 2015 |
| Defendants. | ) ) ) | |

LAU, J. — The trial court found that Peter and Julia Torkild fraudulently promised John and Darcee Johnston that they would help the Johnstons save their home from imminent foreclosure. In reliance on that promise, the Johnstons took no

further steps to avoid the foreclosure. The Torkilds then arranged to purchase the Johnstons' property, which they subdivided and sold. As a result of the Torkilds' fraud, the Johnstons lost their home and the equity in their property. Because substantial evidence supports the trial court's findings of fraud, and the Torkilds fail to demonstrate any abuse of discretion in the trial court's evidentiary rulings, we affirm.

## FACTS AND PROCEDURAL HISTORY

Following a two-week trial, the trial court entered 285 findings of fact. The unchallenged findings of fact support the following factual summary.

In 1992, John and Darcee Johnston purchased a six-acre subdividable parcel of property on Lummi Island and built a house. The Johnstons became delinquent in their mortgage payments, and on October 23, 2003, Horizon Bank issued a notice of foreclosure.

After receiving the foreclosure notice, the Johnstons explored options for saving their property. Darcee[1] was able to qualify for a refinancing loan through Creative Mortgage, but decided to look for other solutions because of the loan's high interest rate.

At around this time, Darcee saw a sign near Birch Bay. The sign displayed Peter Torkild's name and telephone number and listed "home loans, mortgages, and

---

[1] Where necessary for clarity, we use the parties' first names.

debt consolidation."[2] Darcee discussed the Johnstons' situation in detail with Peter during numerous telephone calls. On March 3, 2004, Darcee met with Torkild at Top Mortgage, where he was working.

Peter claimed to be an experienced real estate broker, mortgage broker, and real estate agent. He told Darcee that he could help her and that the best way to proceed would be to permit him, "or his compatriot,"[3] to purchase the Johnstons' property either directly or through foreclosure, lease it to the Johnstons for a period of time, and then allow the Johnstons to repurchase the property. Peter never intended to sell the property back to the Johnstons.

Ostensibly in support of the plan, Peter had prepared several documents for the meeting, including a purchase and sale agreement for his purchase of the property, a deed in lieu of foreclosure in Peter's favor, a statutory warranty deed in his favor, and an assignment and agreement that Peter could buy the Johnstons' promissory note from Horizon Bank. Some of the provisions in the documents were not consistent with Peter's oral representations.

Peter also prepared an agreement providing that he would purchase the property at the trustee sale or purchase the promissory note and conduct the trustee sale himself for the purpose of eliminating the second mortgage on the property. The agreement recited that the Johnstons would have the opportunity to lease the

---

[2] Clerk's Papers (CP) at 68.
[3] CP at 82.

property after the sale and that the future lease might contain an option to purchase the property in one or two years. The document also provided that the Johnstons agreed not to disclose the arrangement, file for bankruptcy, refinance the property, or take any actions that would interfere with the foreclosure. The agreement included "numerous waivers, disclaimers, and hold harmless provisions"[4] that purported to protect Peter and Julia Torkild.

Peter told Darcee to take the documents home and have John sign them. None of the documents were ever used in the subsequent transactions. Relying on Peter's assurances and representations, the Johnstons undertook no further actions to avoid foreclosure.

On March 10, 2004, Peter opted not to purchase the Johnstons' property himself. On March 18, 2004, Julia Torkild incorporated First Capital, Inc. The Torkilds funded First Capital on March 24, 2004, with joint assets. The trial court found that the Torkilds treated the corporation "as an alter ego in an attempt to shield themselves."[5]

On March 25, 2004, First Capital purchased the Johnstons' promissory note from Horizon Bank. On March 29, 2004, Darcee provided a letter requesting that Peter be named as successor trustee. On March 31, 2004, First Capital appointed

---

[4] CP at 71.
[5] CP at 83.

Peter as the successor trustee. On April 2, 2004, Peter conducted the trustee sale. First Capital purchased the property, thereby eliminating the second mortgage.

On April 6, 2004, the Johnstons entered into a 25-month lease with First Capital for three acres of the six-acre property. The lease did not contain an option to purchase. Although Peter had initially represented to the Johnstons that the monthly rent would be about the same as the first mortgage payment, the lease payments were nearly the same as both the first and second mortgages plus taxes.

On April 10, 2004, First Capital deeded the property to Julia Torkild for $300,000. Julia financed the purchase with a loan from Aegis. Peter quitclaimed any interest in the property to Julia.

On August 3, 2004, while the lease was still in place, Peter began investigating a short plat of the remaining three acres of the property. Peter continued to reassure the Johnstons that "We will take care of this for you."[6] At a meeting with Darcee in December 2005, Peter said that he intended to sell the property to the Johnstons, but later indicated that he would not sell the property. Also in December 2005, Julia, as president of First Capital, filed an unlawful detainer action against the Johnstons. In May 2006, after the lease expired, the trial court granted a writ of restitution.

---

[6] CP at 77.

The Torkilds eventually subdivided the Johnstons' property into two parcels and sold them to a third party. First Capital was dissolved in 2007, shortly after completion of the short plat.

The Johnstons filed this action against the Torkilds and First Capital on February 26, 2008, alleging numerous claims, including fraud, breach of contract, conspiracy, and violations of the Credit Services Organizations Act, chapter 19.134 RCW, Consumer Protection Act (CPA), chapter 19.86 RCW, Washington Deed of Trust Act, chapter 61.24 RCW, Washington Debt Adjusting Act, chapter 18.28 RCW, Truth in Lending Act, and Mortgage Broker Practices Act, chapter 19.146 RCW.

Following a two-week bench trial in March 2013, the trial court found that the Torkilds had fraudulently induced the Johnstons to allow them to take over the foreclosure proceedings and purchase the property. Based on the Torkilds' false promises and assurances that they would be able to repurchase the property, the Johnstons complied with the Torkilds' demands that they not pursue available remedies to avoid the foreclosure. The court found that as a result of the fraud, the Johnstons lost the opportunity to preserve their home and land, resulting in the loss of their home and their equity in the property. The court found that Peter had also violated the Consumer Protection Act, the Deed of Trust Act, and the Mortgage Broker Practices Act, but rejected the Johnstons' remaining claims.

The court entered a judgment in favor of the Johnstons for $551,152.05 plus attorney fees, including damages for emotional distress, the loss of equity in the

property at the time of the foreclosure, and the loss of use and enjoyment of the property.

## ANALYSIS

The trial court found that the Johnstons had established each of the nine elements of fraud by clear, cogent, and convincing evidence: (1) a representation of existing fact, (2) its materiality, (3) its falsity, (4) the speaker's knowledge of its falsity, (5) the speaker's intent that it be acted upon by the person to whom it is made, (6) ignorance of its falsity on the part of the person to whom the representation is addressed, (7) the latter's reliance on the truth of the representation, (8) the right to rely upon it, and (9) consequent damage. See Elcon Constr., Inc. v. E. Wash. Univ., 174 Wn.2d 157, 166, 273 P.3d 965 (2012). On appeal, the Torkilds contend that the evidence and findings failed to establish that their fraudulent representations and actions caused the Johnstons to lose their home. They argue that the Johnstons' inability to afford their mortgage payments was the sole cause of the foreclosure sale and the loss of their property.

This court reviews factual findings for substantial evidence. In re Dependency of A.V.D., 62 Wn. App. 562, 568, 815 P.2d 277 (1991). When a challenged factual finding must be proved at trial by clear, cogent, and convincing evidence, we incorporate that standard into our review and determine whether there is substantial evidence in light of the "highly probable" test. In re Sego, 82 Wn.2d 736, 739, 513 P.2d 831 (1973). We view the evidence and all reasonable inferences in the light

most favorable to the prevailing party. Woody v. Stapp, 146 Wn. App. 16, 22, 189 P.3d 807 (2008).

The trial court found that in reliance on the Torkilds' assurances, the Johnstons undertook no further actions to preserve their property until after the foreclosure was completed and they had been evicted from their house. The court expressly found that the Johnstons could have sold a portion of the property or all of the property to a willing neighbor, accepted the available loan from Creative Mortgage, or filed for bankruptcy. The Torkilds contend that the court's determination of causation rests solely on speculation because the evidence failed to establish that any of the options were viable.

Charles Bailey, a neighbor, testified that he would have been willing to negotiate a purchase of part or all of the Johnstons' property in 2004. He confirmed that he had the money available and would have been willing, on short notice, to pay for a right of first refusal in a future sale or provide a short-term loan to give the Johnstons time to structure the transaction in light of the impending foreclosure.

The Torkilds' claim that there was no evidence supporting the trial court's finding that the Johnstons' property was "capable of subdivision"[7] is disingenuous. After evicting the Johnstons from the property, the Torkilds subdivided the property and sold the two resulting parcels.

---

[7] CP at 68.

The Torkilds also assert that there was no evidence that the Johnstons could have subdivided the property and sold it within the short period of time remaining until the foreclosure. They maintain that any attempt to sell off a portion of the property before subdividing it would have been unlawful under Whatcom County land use regulations.

But Bailey testified that he was sufficiently interested in buying three acres of the Johnstons' property to provide them with sufficient time, including loaning them money or buying a right of first refusal, to structure the transaction around the foreclosure proceeding. Bailey's assistance did not require violation of Whatcom County land use regulations.

The Torkilds next contend that the evidence and findings failed to establish that the Johnstons could have obtained a loan to refinance the property. They argue that there was no evidence establishing that "the company was real," what the precise terms of the loan were, the "conclusiveness of the approval,"[8] or whether the offer was still available closer to the time of the foreclosure.

Darcee testified that in early 2004, Horizon Bank referred her to another lender who approved her loan application. Darcee identified the lender as Creative Mortgage and described the location of the office. But she then decided to look for other options because of the high interest rate, a decision that led her to Peter

---

[8] Br. of Appellants, at 26.

Torkild. The trial court found Darcee's testimony to be credible. Substantial evidence supports the court's finding that refinancing was an option.

The Torkilds also contend that the evidence failed to support the trial court's finding that bankruptcy was a viable option. They argue that the Johnstons made no showing that could have satisfied the requirements for a bankruptcy filing or that they ultimately would have been able to save their property through this option.

But the parties stipulated that the Johnstons could have delayed the foreclosure sale by filing for bankruptcy, even though the ultimate success of that option was undetermined. The possible bankruptcy filing, which Darcee acknowledged would have been a last resort, must be viewed in conjunction with the refinancing and sale options that the Johnstons could have pursued.

The Torkilds do not challenge the trial court's findings that they assured the Johnstons they would help them avoid the loss of their property. In reliance on those assurances, the Johnstons complied with the Torkilds' express demands that they not cure the deficiency, pursue refinancing or bankruptcy, or otherwise interfere in any manner with the foreclosure. Many of the Torkilds' allegations about the Johnstons' ability to pursue available options and the possible outcomes involve issues of credibility that the trial court resolved adversely to the Torkilds. This court must defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and persuasiveness of the evidence. State v. Myers, 133 Wn.2d 26, 38, 941 P.2d 1102 (1997).

70719-1-/11

Viewed in the light most favorable to the Johnstons, substantial evidence established viable options that they could have pursued to stop the foreclosure sale.

The Torkilds next contend the trial court erred when it failed to consider the testimony of their handwriting expert, Hannah McFarland. McFarland testified that John Johnston's signatures on the documents that Peter gave to Darcee at the first meeting were not genuine. The trial court found that McFarland qualified as an expert but declined to consider the testimony in its decision. We review the trial court's admission or exclusion of expert testimony for an abuse of discretion. Philippides v. Bernard, 151 Wn.2d 376, 393, 88 P.3d 939 (2004).

The Torkilds argue that McFarland's testimony undermined the Johnstons' credibility and "proved" the Torkilds' theory that John Johnston "fabricated his trial testimony"[9] to hide the fact that Darcee never told him about Peter's representations. They allege that "Mr. Johnston subsequently pretended to know about the alleged representation only because Ms. Johnston commenced the lawsuit."[10]

The trial court concluded that the genuineness of John's signature on the documents that McFarland examined was not relevant because "[the documents] were not used. They were not operative documents."[11] The Torkilds have not provided any persuasive argument suggesting how McFarland's testimony about

---

[9] Br. of Appellants, at 39.
[10] Br. of Appellants, at 40.
[11] CP at 72.

John's signature on the documents would have undermined the Johnstons' testimony or credibility about the transaction. Nor have they identified any evidence in the record supporting their conclusory allegations that John's testimony was fabricated or that Darcee never told John about her meeting with Peter and forged his signature on the documents. The partial verbatim report of proceedings that the Torkilds provided this court contains none of John's trial testimony and only brief excerpts from Darcee's testimony. Under the circumstances, the Torkilds have not demonstrated that the trial court abused its discretion in not considering McFarland's testimony.

The Torkilds next contend that the trial court should have subtracted the balance due on the second mortgage when calculating the Johnstons' loss of equity and should have subtracted the Johnstons' rent payments when awarding damages for their loss of use and enjoyment of the property. But the Torkilds have not supported these contentions with any meaningful legal argument or citation to relevant authority. Nor have they provided this court with a record of the arguments they presented to the trial court on these issues. We therefore decline to consider the alleged errors. See Ang v. Martin, 154 Wn.2d 447, 487, 114 P.3d 637 (2005) (appellate court will not review assignments of error unsupported by argument or citation to authority); see also RAP 10.3(a)(6).

Finally, the Torkilds contend that the trial court's decision on the Johnstons' remaining claims, including violations of the CPA and Mortgage Broker Practices Claim, are derivative of the fraud claim and must also be reversed. Because

substantial evidence supports the trial court's fraud determination, the Torkilds' challenges to the remaining claims also fail.

The trial court awarded the Johnstons attorney fees under the CPA. See RCW 19.86.060. As the prevailing party on appeal, the Johnstons are also entitled to attorney fees on appeal, subject to compliance with RAP 18.1(d).

Affirmed.

WE CONCUR: