# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| KEISHA BAUMGARTNER, as personal representative of the Estate of ANGELA BAUMGARTNER, deceased,<br><br>Appellant,<br><br>v.<br><br>COLUMBIA ANESTHESIA GROUP, P.S., MARK A. MOREHART, MD,<br><br>Respondents,<br><br>THE VANCOUVER CLINIC, INC., P.S., JASON ANAST, MD, ERIC KLINE, MD, LEGACY SALMON CREEK HOSPITAL, a health care entity, CHRISTOPHER FRALEY, MD, SPECIALTYCARE, INC., MICHELLE L. HENDRIX,<br><br>Defendants. | No. 48070-1-II<br><br><br><br>UNPUBLISHED OPINION |

MAXA, A.C.J. – Keisha Baumgartner appeals the summary judgment dismissal of her medical malpractice wrongful death claim against anesthesiologist Dr. Mark Morehart and Columbia Anesthesia Group, P.S. (together Dr. Morehart).[1] Baumgartner filed suit based on the death of her mother, Angela Baumgartner (Ms. Baumgartner), from excessive blood loss during surgery.

---

[1] Baumgartner also filed suit against Michelle Hendrix, SpecialtyCare, Inc., and Legacy Salmon Creek Hospital. However, all defendants other than Dr. Morehart and Columbia Anesthesia Group settled with Baumgartner and were dismissed from this appeal.

Ms. Baumgartner was a Jehovah's Witness who refused to accept blood transfusions. But she accepted the use of a "cell saver" machine, which is designed to collect the patient's lost blood, recycle that blood, and re-infuse the blood into the patient's own body. During surgery Ms. Baumgartner began bleeding heavily, but the suction tube used to collect her blood dropped below the sterile field and became contaminated before it could collect any blood. The cell saver machine technician, Michelle Hendrix, announced that Jehovah's Witness protocol had been broken and the machine had been contaminated, and therefore that the machine could no longer be used. The surgery proceeded without the cell saver machine. Ms. Baumgartner eventually died because of her blood loss.

Baumgartner argues that Dr. Morehart was negligent in failing to direct the surgical team to set up the cell saver machine on standby and failing to direct Hendrix to continue using the machine during Ms. Baumgartner's surgery after replacing the contaminated suction tube.[2] We hold that Baumgartner's claims fail because she did not establish (1) that the standard of care required the cell saver machine to be set up on standby, and (2) what standard of care applied when Hendrix announced to the surgical team that the entire cell saver machine had been contaminated, not just the suction tube.

Accordingly, we affirm the trial court's summary judgment dismissal of Baumgartner's claims against Dr. Morehart.

---

[2] Baumgartner also argues that the trial court erred in denying her summary judgment motion on the application of assumption of risk and contributory negligence. Because we affirm the trial court's summary judgment dismissal, we do not address these issues.

FACTS

Ms. Baumgartner had a small mass on her left kidney. Her doctors recommended surgically removing the mass through robot-assisted laparoscopic surgery, a minimally-invasive procedure.

Before the surgery, Ms. Baumgartner discussed the operation's risks with the surgeon, Dr. Jason Anast. Dr. Anast informed her of possible complications, including excessive blood loss, anemia, and death. Ms. Baumgartner indicated that her religious beliefs as a Jehovah's Witness prevented her from receiving blood transfusions. Dr. Anast explained that without the possibility of a blood transfusion, the surgery's risks would increase.

Before her surgery, Ms. Baumgartner signed a Durable Power of Attorney for Health Care, indicating that she refused any blood transfusions even if her doctors believed that a transfusion was necessary to preserve her life. However, she noted that she would accept the use of a cell saver machine. Dr. Morehart, the anesthesiologist for her surgery, confirmed in person Ms. Baumgartner's choices regarding blood transfusions.

*Jehovah's Witnesses and Blood*

Jehovah's Witnesses' beliefs prevent them from receiving blood from another person or from receiving their own blood after it has left their body. A Jehovah's Witness who receives a blood transfusion in violation of this belief will be excommunicated from the church and will not go to heaven. However, their beliefs allow blood that is removed from their bodies to be returned, so long as the blood is continuously in contact with their circulatory systems. Under this theory, Jehovah's Witnesses allow for the use of a cell saver machine.

*Cell Saver Machine*

The cell saver machine is used to recycle blood a patient loses during surgery. The machine works by suctioning blood in the body cavity through a nozzle and collecting the blood in a reservoir. That blood is then filtered and pumped to a storage bag.

In order to comply with Jehovah's Witnesses' beliefs, the blood storage bag must be connected to the patient through an IV so that the patient's blood always has an entryway back into the body. This creates a "circuit," which requires that the cell saver machine's output end be continuously connected to the patient's IV line. Clerk's Papers (CP) at 504. However, there was evidence presented that Jehovah's Witness beliefs do not require the suction input to be continuously in contact with the patient.

The cell saver machine can be set up on standby, where it is in the operating room and ready for use but the IV is not started. If excessive blood loss begins, the IV can be started and the machine can be available quickly.

*Ms. Baumgartner's Surgery*

Ms. Baumgartner's surgery took place at Legacy Salmon Creek Hospital (LSCH). LSCH arranged for the cell saver machine and for Hendrix to operate it. Hendrix was an employee of SpecialtyCare, Inc. LSCH also arranged for Dr. Morehart to provide anesthesia services. Before the surgery began, Hendrix explained to the surgery team her understanding of what Jehovah's Witness protocol required – that before the first incision there must be a continuous, closed circuit from the cell saver's suction input, through the cell saver, and back to the patient. Hendrix's understanding of the required circuit came from her training from SpecialtyCare. The cell saver machine was connected to Ms. Baumgartner at the beginning of the surgery.

4

The surgery initially went as planned with minimal blood loss. At one point, Hendrix left the operating room to use the rest room. In the five minutes she was gone, Dr. Anast detached the tumor, which caused unexpected bleeding. Pooling blood began to obscure the doctors' view and the cell saver's suction was unable to keep up. Dr. Anast decided to convert to an "open" surgery. CP at 277. As the doctors removed the surgery robot's arm attachments, the cell saver machine's suction tube fell out of the sterile surgical field.

When Hendrix returned from the rest room, she saw the cell saver machine's suction tube lying on the floor. According to Hendrix, the suction was still on. She immediately notified the surgical team that the suction tube had become contaminated. Further, because the suction was on, Hendrix believed that the interior of the machine – the blood reservoir – had been contaminated. She stated, "The problem . . . is it was not just the suction line that fell on the floor that was contaminated. The suction line is connected to the reservoir which collects the blood and whatever touches that – whatever that suction line is sucking up, it's going straight to the blood and contaminating it." CP at 568. Therefore, she announced to the entire room that the reservoir had been contaminated.

Hendrix also insisted, based on her understanding of the continuous circuit required by Jehovah's Witnesses, that replacing the suction tube would not maintain the continuity required by Ms. Baumgartner's beliefs. Hendrix refused Dr. Anast's request to replace the contaminated suction tube and continue using the cell saver machine. Dr. Morehart was not able to see the suction line from where he was standing and did not provide input to the decision to stop using the machine. No blood was processed using the cell saver machine.

5

After the surgery was completed, Ms. Baumgartner was transported to the intensive care unit. She had lost an estimated 2,500 milliliters of blood, which Dr. Morehart estimated to be about 40 percent of her total blood volume. As a result of her blood loss, Ms. Baumgartner died a few hours later from shock and anemia.

*Lawsuit and Summary Judgment*

Baumgartner filed a wrongful death action against Dr. Morehart and several other defendants. Dr. Morehart filed a summary judgment motion on negligence and proximate cause. In opposition, Baumgartner relied heavily on the declarations and deposition testimony of Dr. Bruce Spiess, an anesthesiologist with experience in the beliefs of Jehovah's Witnesses toward blood in surgery and the use of the cell saver machine. The trial court granted summary judgment in favor of Dr. Morehart, dismissing Baumgartner's claim.

Baumgartner appeals the trial court's summary judgment order.

ANALYSIS

Baumgartner argues that the trial court erred in granting summary judgment in favor of Dr. Morehart on her medical malpractice claims. She claims that Dr. Morehart was negligent in (1) failing to direct the surgical team to set up the cell saver machine on standby, and (2) failing to direct Hendrix to continue using the cell saver machine during surgery after replacing the contaminated suction tube. We hold that Baumgartner presented sufficient evidence to create genuine issues of material fact regarding these claims.

A.    LEGAL PRINCIPLES

We review summary judgment orders de novo. *Keck v. Collins*, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). We construe all evidence and reasonable inferences in favor of the

nonmoving party. *Id.* Summary judgment is appropriate when the record shows no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. CR 56(c); *Keck*, 184 Wn.2d at 370. A fact is material if it affects the case's outcome. *Keck*, 184 Wn.2d at 370 n.8. An issue of fact is genuine if the evidence would be sufficient for a reasonable jury to find in favor of the nonmoving party. *Id.* at 370. "If reasonable minds can reach only one conclusion on an issue of fact, that issue may be determined on summary judgment." *Sutton v. Tacoma Sch. Dist. No. 10*, 180 Wn. App. 859, 865, 324 P.3d 763 (2014).

When seeking summary judgment, the initial burden is on the moving party to show there is no genuine issue of material fact. *Elcon Constr., Inc. v. E. Wash. Univ.*, 174 Wn.2d 157, 169, 273 P.3d 965 (2012). Once the moving party has made such a showing, the burden is on the nonmoving party – here, Baumgartner – to set forth specific facts that rebut the moving party's contentions and indicate a genuine issue of material fact. *Id.* But conclusory statements and speculation submitted by the nonmoving party will not preclude summary judgment. *Id.*

To recover damages in a medical malpractice action, a plaintiff must establish that his or her "injury resulted from the failure of a health care provider to follow the accepted standard of care." RCW 7.70.030(1). A plaintiff must prove both that a health care provider failed to meet the applicable standard of care and that such failure was a proximate cause of the plaintiff's injuries. RCW 7.70.040; *Keck*, 184 Wn.2d at 370. The standard of care is "that degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which he or she belongs, in the state of Washington, acting in the same or similar circumstances." RCW 7.70.040(1).

7

In a medical malpractice action the applicable standard of care and proximate cause generally must be established by expert testimony. *Grove v. PeaceHealth St. Joseph Hosp.*, 182 Wn.2d 136, 144, 341 P.3d 261 (2014). The expert testimony must establish what a reasonable doctor would or would not have done under the circumstances, that the defendant failed to act in that manner, and that this failure caused the plaintiff's injuries. *Keck*, 184 Wn.2d at 371.

B.      FAILURE TO SET UP THE CELL SAVER MACHINE ON STANDBY

Baumgartner argues that Dr. Morehart violated the standard of care for anesthesiologists by failing to know that Jehovah's Witnesses' beliefs do not require the cell saver machine to be connected to Ms. Baumgartner at the beginning of the surgery and failing to direct the surgical team to set up the machine on standby. We hold that Baumgartner did not produce any evidence that the standard of care *required* that the cell saver machine be set up on standby.[3]

Baumgartner's argument assumes that Dr. Spiess's testimony established that the standard of care required Dr. Morehart to direct that the cell saver machine be set up on standby. However, Dr. Spiess's testimony did not establish such a standard of care.

In his deposition, Dr. Spiess stated his opinion that the cell saver machine should be set up on standby. He reasoned that, "[i]f you have got enough blood coming into the laparoscopic surgery that it needs to go to a Cell Saver, you have to convert to an open case, so why even have [the cell saver] connected." CP at 1850-51. But he did not state in his deposition that the standard of care *required* setting up the cell saver machine on standby.

---

[3] Initially, Dr. Morehart argues that Baumgartner should not be able to assert his standby theory on appeal because (1) this claim was improperly first asserted in response to his summary judgment motion, and (2) the summary judgment declaration of Dr. Spiess, Baumgartner's expert, on this issue improperly contradicted his prior deposition testimony. We reject both arguments and consider this issue on the merits.

In his first summary judgment declaration, Dr. Spiess stated as follows regarding the cell saver machine:

> [G]enerally the machine and operator are made available on standby . . . if and when the need were to arise. Standby is perfectly acceptable to Jehovah's Witnesses who accept cell salvage, contrary to Ms. Hendrix's misconceptions or what she was taught by SpecialtyCare.

CP at 1652. But Dr. Spiess did not state in that declaration that the standard of care *required* the cell saver machine to be set up on standby.

In his second summary judgment declaration, Dr. Spiess agreed with another expert that for a laparoscopic surgery like Ms. Baumgartner's, where minimal blood loss was expected, "the cell saver would not be hooked up to the patient unless and until excessive bleeding occurred." CP at 1639. And he again confirmed his opinion that "a standby set up is acceptable to Jehovah's Witnesses who accept cell salvage." CP at 1639. Finally, Dr. Spiess stated, "The standard of care requires that the anesthesiologist *be aware* that a standby set up . . . is acceptable to Jehovah's Witnesses and meets the requirements of a continuous circuit." CP at 1640 (emphasis added). But Dr. Spiess did not state in that declaration that the standard of care *required* the cell saver machine to be set up on standby.

Regarding Dr. Morehart's failure to meet the standard of care, Dr. Spiess focused on Hendrix's announcement that Jehovah's Witness protocol required the cell saver machine to be connected to Ms. Baumgartner before surgery could begin. Dr. Spiess stated that Dr. Morehart knew or should have known that this announcement showed that Hendrix was ignorant of standby set up, and that "Dr. Morehart failed to disabuse the surgical team of Ms. Hendrix['s] misconception, and direct that the standby be employed." CP at 1641. But the opinion that Dr.

Morehart failed to direct that the cell saver machine be used on standby was not tied to any identified standard of care.

Dr. Spiess's deposition and two declarations show that it was *acceptable* to Jehovah's Witnesses to set up the cell saver machine on standby and that the machine normally is set up on standby for a procedure like Ms. Baumgartner's surgery. But he did not testify that Dr. Morehart or anyone else violated the standard of care by not setting up the machine on standby.

Baumgartner has not demonstrated that a standard of care required Dr. Morehart to direct that the cell saver machine be set up on standby. Accordingly, we affirm the trial court's grant of summary judgment on this issue.

C.     FAILURE TO CONTINUE USING THE CELL SAVER MACHINE AFTER CONTAMINATION

Baumgartner argues that the standard of care requires that an anesthesiologist know that Jehovah's Witnesses' beliefs do not prohibit using the cell saver machine after replacing a contaminated part. She further argues that Dr. Morehart violated this standard of care by not directing Hendrix to replace any contaminated tubing and continue using the machine after the tubing fell to the floor. We hold that summary judgment was appropriate because Baumgartner did not identify the anesthesiologist's standard of care when, as here, the anesthesiologist has no basis to contest the cell saver technician's announcement that the entire cell saver machine had been contaminated.

1.    Breach of Identified Standard of Care

Dr. Spiess testified that an anesthesiologist "must possess and employ the knowledge that the [cell saver machine's] continuous circuit does not prohibit replacing components . . . that become contaminated in the course of [surgery]." CP at 1640-41. He further testified that Dr.

Morehart failed to meet the required standard of care by not correcting Hendrix when she announced that contamination of the suction tube broke the circuit and that Jehovah's Witness protocol did not allow replacing the suction tube and continuing to use the cell saver machine.

Dr. Morehart challenges the competency of Dr. Spiess's testimony, arguing that Dr. Spiess's opinion regarding the nature of the Jehovah's Witness circuit lacked factual support and therefore was not admissible to establish a standard of care. We assume without deciding that Dr. Spiess's testimony was admissible, and therefore we agree that there was a question of fact regarding whether Dr. Morehart failed to meet the standard of care *that Dr. Spiess identified*.

2. Dr. Morehart's Knowledge Regarding Contamination

Dr. Morehart argues that Dr. Spiess's standard of care regarding when a component part is contaminated is inapplicable here because there was evidence that the entire cell saver machine was contaminated, not just the suction tube, and Dr. Morehart was not in a position to refute that evidence. We agree.

As a threshold issue, the parties dispute whether only the suction tube was contaminated or whether the machine's interior was contaminated. Hendrix testified that the suction was on when the suction tube fell below the sterile field, which contaminated the entire machine. If the machine's interior was contaminated, Baumgartner does not appear to dispute that the machine could no longer be used without resetting the entire machine. Dr. Spiess testified that the machine's interior could not have become contaminated because the suction must be operated manually by the surgeon and therefore the suction would not have been on when the suction tube

11

fell below the sterile field.[4] He claimed that because the suction was not on, all that needed to be replaced was the tube itself.

But the complicating factor here is that, regardless of whether the suction *actually* was on when the suction tube fell to the floor, Hendrix *announced* to Dr. Morehart and the surgical team that the suction had been on and that the blood reservoir had been contaminated. At that time, Dr. Morehart was behind the surgical curtain and could not see for himself what had happened with the suction tube. Baumgartner does not contest either of these facts. Therefore, Dr. Morehart had no basis for contradicting Hendrix's announcement.

Dr. Spiess provided an opinion regarding the standard of care for when a component part of the cell saver machine is contaminated. But the standard of care when only one component of the cell saver machine is contaminated is immaterial under the facts here. The question here is the appropriate standard of care for an anesthesiologist when the cell saver machine technician announces that the entire cell saver machine has been contaminated and the anesthesiologist has no basis for contradicting that announcement.

Dr. Spiess provided no testimony regarding the standard of care when the technician announces that the entire machine has been contaminated. Specifically, he did not testify that Dr. Morehart had an obligation to order Hendrix to simply replace the suction tube and continue using the machine if its interior was contaminated. And Dr. Spiess did not testify that an anesthesiologist's standard of care required Dr. Morehart to know that the suction was manually

---

[4] Dr. Spiess's testimony was inconsistent with Hendrix's testimony on this point. She testified that she controlled the suction from a control panel so that the suction would continue until she stopped it.

operated and could not have been on when the tube fell to the floor. Dr. Spiess simply did not address these issues.

To avoid summary judgment in a medical negligence claim, a plaintiff must prove that a health care provider failed to meet the *applicable* standard of care. *Keck*, 184 Wn.2d at 370. Dr. Spiess's testimony about the standard of care when only a component part of a cell saver machine is contaminated is not applicable under the undisputed facts here.

We hold that Dr. Morehart did not breach any identified standard of care given the undisputed fact that Hendrix told the surgery team that the entire machine had been contaminated and Dr. Morehart had no knowledge whether her statement was true or false.

CONCLUSION

We affirm the trial court's grant of summary judgment in favor of Dr. Morehart and the dismissal of Baumgartner's claims against him.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
MAXA, A.C.J.

We concur:

_____
JOHANSON, J.

_____
MELNICK, J.