FILED
COURT OF APPEALS
DIVISION II

2013 OCT 29 AM 9:49

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| MICHAEL A. LIBERA,<br><br>Appellant,<br><br>v.<br><br>CITY OF PORT ANGELES, a municipality in the State of Washington; ROGER VESS, Assistant Civil Engineer for the City of Port Angeles, in his official capacity; STEPHEN SPERR, City Engineer for the City of Port Angeles, in his official capacity,<br><br>Respondents. | No. 43807-1-II<br><br><br><br><br>UNPUBLISHED OPINION |

WORSWICK, C.J. — Michael Libera appeals summary dismissal of his claims against the

City of Port Angeles, which had delayed connecting Libera's property to the City storm drain.

Libera argues that the superior court erred in dismissing his claim of intentional interference with

business expectancy by government delay both on statute of limitations grounds and on the

merits. Because Libera failed to establish an issue of material fact as to whether the City had an

improper purpose or used improper means in delaying connecting Libera's property to the City's

storm drain, we affirm summary judgment in favor of the City.

## FACTS

Michael Libera owned property on Fairmount Avenue in Port Angeles. Libera began

pursuing a plan to operate a "quick lube" business on the property to recycle oil from "big rig"

trucks. Clerk's Papers at 142, 219. The City's storm drain serving Libera's property was an old

clay tile structure approximately 200 feet long, ending 100 feet short of the intersection of

Fairmount Avenue and SR (service road) 101. Libera contacted the City once in 1984 and again in 1988 about paving the parking lot on his property, and about the problems that the defective storm drain would cause on his property. Libera told the City that the storm drain caused water to pool at the intersection of Fairmont Avenue and SR 101. Libera wanted the City to repair and upgrade the storm drain so that he could reliably connect his property to it without water pooling on his property during his business operations. The City responded to both contacts by letter, but mentioned only the paving requirements, not the storm drain. Libera secured his first set of permits for his oil business around 1984.[1]

Sometime in the 1990's Libera again requested and received building permits for his oil business. In 1995, he began to seek bids from consulting engineers; in 1996 he had a professional engineer prepare plans for the property's drainage system. In 1997, however, Libera slowed development on his oil business to focus on a grocery store business. During this time, his permits for his oil business expired. Other than to make a business plan in the early 2000's, Libera did not significantly develop the property in preparation for his business from the late 1990's until around 2007.

In 2007, Libera again began developing the property in earnest, and sought to acquire a new set of permits from the City. When he began this new process, he expected to open his business within one year. The City did not respond to Libera's requests to repair the storm drain until months later, on January 22, 2008, with a letter informing him that he needed to update his

---

[1] It is unclear from the record whether the permits Libera acquired over time were building permits, business permits, or both.

2

development plans to provide for a number of additional storm water requirements added as of 2005.

The City's new rules required Libera to construct oil/water separators, infiltration systems, foundation drains, and a catch basin with a drywell. Libera had concern about the City's new requirements, because he believed they would cause water to pool on his property, and the City provided no instructions on how to remove that pooled water. Libera had expected that the City would allow him to connect his property to the storm drain, thus resolving the drainage problems on his property.

In March or April of 2008, the City's Assistant Civil Engineer Roger Vess met with Libera, a meeting Libera had attempted to set up for months. Vess informed Libera that the City would not repair the storm drain, nor would the City allow Libera to connect his property to the storm drain.[2] Vess told Libera that Libera could continue developing his property by paving the road (which Libera estimates would have cost him $22,000). Vess left Libera with the impression that if Libera did this, then two to three months later, the City would remove the new pavement, fix the drain, and repave the road, all at the City's expense. Libera stated that tearing up and repaving the road would have shut down his business for a period of time. The City refused two requests from Libera to allow him to fix the storm drain at his own expense.

---

[2] It is unclear from the record whether the City explicitly prohibited Libera from connecting his property to the storm drain, or whether the City merely refused to fix the storm drain—and refused to allow Libera to fix it—thus making it impossible for Libera to connect his property to the storm drain. Taking the facts in the light most favorable to Libera, we assume that the City both refused to fix the storm drain and explicitly prohibited Libera from connecting his property to the storm drain until it was fixed.

3

Libera claims that he was "basically ready to open" his business at this time, and would have done so but for the City's refusal to connect his property to the storm drain. Libera cites two reasons as to why he could not continue any development of his property until the City fixed and connected his property to the storm drain: First, no reputable contractor would complete Libera's paving work and connect his property to the City's storm drain while the drain was still defective.[3] Second, Libera did not want to open his business without a repaired storm drain because water could potentially pool at the entrance and other areas of his property and damage the oil/water separator system he had installed per the City's requirements.[4]

On March 27, 2008, Libera attempted to make it possible to connect his property to the storm drain by "jetting" it for $521.67, as suggested by an unidentified City employee. CP at 233. Shortly after jetting the system, the City installed a new utility pole, breaking the storm drain and reburying the south end of the storm drain that Libera had just jetted. Libera discovered that the new utility pole had buried the storm drain while he was with an expert working for WA DOT Capital, a potential lender to Libera's oil business.

---

[3] For example, Libera claimed that he could not install a legally appropriate catch basin because the WSDOT (Washington State Department of Transportation) requires a catch basin to be 18 inches deep, whereas the City's storm drain was only 5 inches deep.

[4] Libera claimed that "the driveway would be under water when it rained, in probably four to six inches of water. A lake, potentially 20 feet across and six inches deep." CP at 241. Libera based this prediction upon severe water pooling that occurred on an adjacent piece of land Libera used to own. However, Libera admitted in his deposition that he neither witnessed nor had evidence of water pooling on his property, only the adjacent land he had owned in the past.

According to Libera, upon learning about the buried storm drain, the expert working for WA DOT Capital said, "[E]nough, we're out of here." CP at 233. In the middle of 2008, one lender rejected Libera's loan request to start the business. Libera claimed that once this lender rejected Libera's loan request, the drain issue "became a moot point." CP at 235. From the time Libera lost his loan in the middle of 2008 until 2010, he searched for other lenders for his oil business.

In July of 2008, Libera hired an attorney to negotiate with the City. During a phone call with Libera's attorney on July 24, 2008, the City agreed that a blockage existed in the storm drain and stated that it would develop a plan to fix the blockage.

The City fixed the broken pipe in December of 2008. However, evidence suggested that the City did not fix the storm drain problems completely then, and had not done so up to June 11, 2012. By December of 2008, Libera lost his loans. One lender quit due to the delay, and another lender went out of business. Libera spent roughly 14 months between late 2007 and December of 2008 trying to get the City to connect his drainage system to the storm drain.

In 2010, Libera again began attempting to develop his property and to complete the development and opening of his oil business. On October 1, 2010, the City and Libera agreed on a plan to permit his oil business. However, due to inability to obtain loans because of bad credit and a lack of income, Libera could not pay the debt on the property (due on April 30, 2009), and could not open his business. He lost the property to foreclosure on April 1, 2011.

Libera sued the City on numerous theories, including intentional interference with business expectancy by government delay. The superior court ruled that the statute of limitations

barred Libera's claims and that, regardless, Libera had failed to state a claim giving rise to the City's liability. The superior court granted summary judgment to the City on all claims. Libera appeals.

ANALYSIS

Libera argues that the superior court erred by granting summary judgment in favor of the City, because he raised an issue of material fact as to whether the City committed an intentional interference with business expectancy by government delay when the City failed to repair the storm drain until December of 2008, and when it installed a new utility pole that buried the storm drain after Libera had cleaned it. Because Libera cannot show that the City acted with either an improper purpose or by improper means, we affirm.[5, 6]

We review summary judgment determinations de novo, engaging in the same inquiry as the superior court. *Harberd v. City of Kettle Falls*, 120 Wn. App. 498, 507, 84 P.3d 1241 (2004). "Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Trimble v. Wash. State Univ.*, 140 Wn.2d 88, 92, 993 P.2d 259 (2000).

---

[5] Libera also argues that the superior court erred in ruling that RCW 4.16.080(2)'s statute of limitations barred his claims. Because we hold that the superior court did not err in granting summary judgment against Libera on the merits of his intentional interference with business expectancy claim, we assume without deciding that RCW 4.16.080(2) did not bar Libera's claims.

[6] Port Angeles argues that the Land Use Petition Act (LUPA) bars Libera's claims. However, LUPA does not apply to "[c]laims provided by any law for monetary damages or compensation." RCW 36.70C.030(1)(c). Libera appeals dismissal of only his damages claim for intentional interference with business expectancy by government delay. Thus, LUPA does not apply.

We consider the facts and all reasonable inferences from those facts in the light most favorable to the nonmoving party. *Harberd*, 120 Wn. App. at 507. However, bare assertions that an issue of material fact exists will not defeat summary judgment in the absence of actual evidence. 120 Wn. App. at 508. Summary judgment is appropriate if reasonable minds could reach but one conclusion from all the evidence. 120 Wn. App. at 507-08.

To establish intentional interference with business expectancy, a plaintiff must prove five elements: (1) that a valid contractual relationship or business expectancy existed; (2) that the defendant knew of that relationship or expectancy; (3) that the defendant intentionally interfered by inducing or causing a breach or termination of that relationship or expectancy; (4) that the defendant interfered with an improper purpose or by improper means; and (5) that damage to the plaintiff resulted from the interference. *Pacific Northwest Shooting Park Ass'n v. City of Sequim*, 158 Wn.2d 342, 351, 144 P.3d 276 (2006).

Thus, Libera must show not only that the City intentionally interfered with his business expectancy, but also that the City interfered either with an improper purpose or by improper means. *Pleas v. City of Seattle*, 112 Wn.2d 794, 803-04, 774 P.2d 1158 (1989). This requires demonstrating not only that the City interfered, but that the City had a duty to not interfere. 112 Wn.2d at 804. The existence of a statute, regulation, recognized common law, or an established standard of trade or profession can establish such a duty. 112 Wn.2d at 804. A court need not find that a defendant acted with ill will, spite, defamation, fraud, force, or coercion in order to find improper purpose or means. 112 Wn.2d at 800.

7

The cases of *Pleas* and *Westmark Development Corporation* demonstrate that in government delay cases, proving improper purpose requires showing that the defendant delayed plaintiff with the purpose of improperly preventing plaintiff's land development, and proving improper means requires showing that the defendant arbitrarily singled out for delay a particular plaintiff or type of plaintiff. *Pleas*, 112 Wn.2d at 804-06; *Westmark Dev. Corp. v. City of Burien*, 140 Wn. App. 540, 560-61, 166 P.3d 813 (2007).[7]

In *Pleas*, plaintiff purchased property on which it planned to build a high-rise apartment. 112 Wn.2d at 796. Responding to political pressure by two interest groups that opposed apartment complexes, defendant Seattle rezoned plaintiff's property to single family residential while plaintiff's permit for the apartment complex was pending. 112 Wn.2d at 796-97. Our Supreme Court held the rezoning arbitrary and capricious, and remanded with instructions to promptly apply the old zoning rules to plaintiff's permit application. 112 Wn.2d at 797-98.

After years of additional delay and a second appeal, our Supreme Court affirmed the trial court's findings of fact that the city had continued to intentionally delay in direct violation of the previous court orders. *Pleas*, 112 Wn.2d at 799-800, 804-05. The Court identified an improper purpose (gaining political favor with politically active and influential organizations by fighting

---

[7] *Pleas* discusses singling out a plaintiff as part of improper means, whereas *Westmark* seems to consider it as part of improper purpose. *Compare Pleas*, 112 Wn.2d at 806, *with Westmark*, 140 Wn. App. at 560. This discrepancy can be explained because singling out has a mental component (deciding to target an individual or business) and an action component (acting to delay the singled out individual or business more than similarly situated individuals or businesses). Regardless, singling out is a critical part of proving the defendant's improperness. *Pleas*, 112 Wn.2d at 806; *Westmark*, 140 Wn. App. at 560.

apartment construction) and an improper means (singling out plaintiff's planned apartment complex so as to block the construction of apartments). 112 Wn.2d at 804-06.

In *Westmark Development Corporation*, a plaintiff in unincorporated King County applied to King County for a permit for an apartment complex. 140 Wn. App. at 543-44. While the permit application was pending in King County, Burien incorporated the area containing plaintiff's property. 140 Wn. App. at 544. Burien agreed to let King County maintain its permitting authority over permits filed prior to incorporation. 140 Wn. App. at 544. However, when King County was close to making a decision on plaintiff's permit, Burien and King County amended their interlocal agreement to transfer permitting authority over plaintiff's property to Burien. 140 Wn. App. at 544.

Burien then delayed approving plaintiff's permit for years, despite similarly situated permits typically taking 30-120 days. 140 Wn. App. at 544-45, 561. Burien's delay was motivated by a desire to prevent apartment construction, and to please a state representative. 140 Wn. App. at 558-60. The attorney who had represented plaintiff, and who had worked on hundreds of SEPA reviews, stated that the case constituted "the longest, most frustrating, delayed process in the history of his career." 140 Wn. App. at 560-61. Thus, Division One of this court held that substantial evidence supported the existence of an improper purpose (preventing apartment construction and pleasing a state representative) and an improper means (arbitrary delay, refusal to respond to inquiries, much longer delay relative to other similarly situated parties). 140 Wn. App. at 560-61. The court also stressed the importance of evidence that the defendant singled out the plaintiff. 140 Wn. App. at 560-61.

Here, even when we take the facts in the light most favorable to Libera, he cannot establish an issue of material fact as to whether the City acted with an improper purpose or by improper means. Libera has failed to show any improper purpose behind the City's actions. The City asked Libera in his deposition if he could think of any reason why the City would not want to see his business open. Libera stated that he could not. Furthermore, Libera stated in his deposition that many of the City's employees had helped him greatly. This evidence does not support an improper purpose on the part of the City.

Libera stated only the following as to a possible improper purpose:

> I believe I did that earlier with regard to Mr. Cutler, That's—that is total speculation. Thank you for allowing me to use that word, because I wasn't at those meetings. But he made me quite angry and I made him quite angry, and that was in 2005 over that annexation issue. I won, he probably didn't like it, but I don't know.

CP at 238. This constitutes a bare assertion without evidence, which is not sufficient to establish an issue of material fact to preclude summary judgment. *Harberd*, 120 Wn. App. at 508.

Libera also asserted that the City's Assistant Civil Engineer Vess acted with malice towards him. Libera stated he felt that Vess had malice towards him because the City would not let Libera connect his property to the storm drain, even though the drainage system that the City required Libera to install on his property would result in water pooling on his property.

However, Libera has failed to allege any facts that Vess personally made the decision to refuse Libera's connection. In addition, Libera has alleged no improper purpose that could have motivated this decision. When asked what Vess did that Libera viewed as malicious, Libera said, "Well, nothing to my face. And I'm only assuming it was him because I wasn't a fly on the

10

wall. He only works for the City. But I could never get that drain . . . ." CP at 82. When asked whether Vess drew the storm water designs, Libera said, "I know he was on the property the most. He was the one that had to deal with my many phone calls or personal visits or, you know, he was the—he was the boots on the ground initially." CP at 82. None of this testimony, even when taken in the light most favorable to Libera, supports any improper purpose behind the City's actions. Thus, no issue of material fact exists as to whether the City acted with an improper purpose.

Libera likewise fails to establish an issue of material fact as to whether the City acted by improper means. Libera alleges no improper means used to achieve the delay. Most importantly, Libera completely fails to allege a disparity and to make a comparison between his experience of delay and the experience of delay suffered by any other individual or business working with the City. Unlike the plaintiffs in both *Pleas* and *Westmark Development Corporation*, Libera does not allege that the City arbitrarily singled out him or his type of business for an especially long or egregious delay. Thus, no issue of material fact exists as to whether the City used improper means in delaying Libera. Thus, we affirm summary judgment because Libera failed to allege any facts supporting that the City delayed his business for an improper purpose or by improper means.

## COSTS

Libera requests that we award him costs on appeal. Libera cites no authority authorizing us to award costs. Regardless, RAP 14.2 grants costs only to parties that "substantially prevail[] on review." Libera is not a substantially prevailing party; and we thus deny his request for costs.

11

No. 43807-1-II

Affirmed.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Worswick, C.J.

We concur:

_____
Hunt, J.

_____
Johanson, J.