IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| GREENSUN GROUP, LLC, | No. 77635-5-I |
| Appellant, | DIVISION ONE |
| v. | PUBLISHED OPINION |
| CITY OF BELLEVUE, | |
| Respondent. | FILED: March 4, 2019 |

CHUN, J. — Greensun Group LLC (Greensun)[1] brought a claim against the City of Bellevue (the City) for tortious interference with business expectancy. We address whether the trial court properly dismissed the claim on summary judgment. In doing so, we discuss each element of the tort. And we discuss the affirmative defense of privilege.

Upon passage of Initiative 502 (I-502) in 2012, the City issued a regulation prohibiting marijuana retail shops from being located within 1,000 feet of each other (the 1,000 Foot Separation). In 2014, the City denied Greensun a license to operate such a shop after determining the business planned to locate too close to another shop deemed "first-in-time."

Greensun then filed this action against the City, claiming violations of the due process and privileges and immunities clauses of the Washington State

---

[1] For clarity, this opinion refers to appellant as "Greensun" although the business also used its trade names in the events leading up to this case.

Constitution. The trial court dismissed the case on summary judgment. Greensun appealed. Because the City adopted its first-in-time rule without engaging in formal rule-making, this court invalidated it.

On remand, Greensun amended its complaint to claim tortious interference with business expectancy. On cross-motions for summary judgment, the trial court dismissed Greensun's claim and declared the City had remedied the rule-making issue identified in the first appeal.

Because genuine issues of fact exist as to the tortious interference claim, we affirm in part and reverse in part the trial court's order denying Greensun's motion for partial summary judgment and granting the City's summary judgment motion. We remand the case for trial.

I.
BACKGROUND

A. Facts

On November 6, 2012, Washington passed I-502. Laws of 2013, ch. 3 § 41. I-502, in part, legalized the possession of limited amounts of marijuana and directed the Washington State Liquor Control Board (the LCB) to develop and implement rules to regulate and tax recreational marijuana retailers by December 31, 2013.

Greensun's managing members, Seth Simpson and David Ahl, leased a retail space at 10600 Main Street, Bellevue, Washington on November 29, 2012. They planned to open a retail marijuana shop there. As such, Greensun made several upgrades to the building. It intended to operate a medical marijuana

business at the space until the LCB implemented the regulations for recreational marijuana. Greensun applied to the City for a building permit on January 8, 2013.

The City opposed Greensun's attempt to open a medical marijuana operation, claiming the proposed use violated Bellevue's Land Use Code (LUC). The City obtained injunctive relief prohibiting the opening of a medical marijuana facility at the location. Greensun then abandoned its plan to open a medical marijuana store. However, because it still planned to use the space for recreational marijuana, it extended its lease through June 30, 2016.

The LCB then opened the application process for retail marijuana licenses. Greensun applied. By March 1, 2014, the LCB had screened Greensun's application and listed it as one of 19 qualified applicants for licenses in Bellevue.

On March 17, 2014, the City adopted Ordinance 6156, which extended Ordinance 6133 B-1[2] for an additional six months and implemented a new restriction—the 1,000 Foot Separation. Under the restriction, no marijuana retailer could be located within 1,000 feet of any other marijuana retailer.

On April 2, 2014, the LCB announced it would process license applications "with geographic distribution and population density in mind." To this end, the LCB allocated a predetermined number of initial licenses for recreational marijuana stores to each jurisdiction. If the number of applicants in a jurisdiction

---

[2] Ordinance 6133 B-1 constituted the first ordinance to include interim zoning controls to regulate recreational marijuana. It did not contain a 1,000 foot separation requirement between retailers.

3

exceeded its number of licenses, the LCB would use a lottery system to determine which applicants it would license. The LCB stated it expected to issue the initial retail licenses in "batches" during the first week of July 2014.

The LCB initially allocated four such licenses for Bellevue. Because 19 qualified applicants sought to open shops in Bellevue, the LCB held a lottery on May 2, 2014. Greensun ranked fifth. Two other applicants, Par 4 Investments LLC (Par 4)[3] and High Society, ranked in the top four.

On May 7, 2014, the City e-mailed High Society about the 1,000 Foot Separation. It explained that "[a] retailer will 'lock down' their location upon submittal of a complete building permit application. This means that once we determine a building permit application complete for review that [sic] we will apply the 1,000 foot separation from that property."

On May 16, 2014, Par 4 applied for its building permit.

Greensun met with the City on May 19, 2014. At the meeting, it told the City the LCB would likely disqualify High Society's application because the business listed the wrong address. It asked how the 1,000 Foot Separation would be applied if Greensun became one of the four lottery winners. The City advised Greensun it would give priority to the applicant who first submitted a complete building permit application. Greensun mentioned it had submitted a complete application for 10600 Main Street in 2013. The City responded that the LCB had to have designated an applicant as a lottery winner to establish priority.

---

[3] For clarity, this opinion refers to this retailer as "Par 4" although the company also used trade names in the events leading up to this case.

On May 21, 2014, the City made the determination that Par 4's building permit application was complete.

On May 27, 2014, a reporter from The Seattle Times asked the City about how it would enforce the 1,000 Foot Separation. The City responded that it "will consider the first retail applicant who submits a complete building permit as the 'first in,' against which the other applicants will be compared for conformance with the requirement."

Around the end of May 2014, Greensun applied to the City for a business license to operate a retail marijuana shop at 10600 Main Street. On June 3, 2014, the City sent a letter to Greensun stating that it "can only approve a business license application for the four selected retailers."[4] The City denied the application.

The City received Par 4's marijuana license application from the LCB on June 4, 2014. The City approved Par 4's proposed location at 10697 Main Street, but stated it "reserves all rights accorded under law to enforce violations of city ordinances and codes as exist now or as hereafter amended."

On June 5, 2014, the LCB notified Greensun that it became one of the four lottery winners because of High Society's disqualification. The LCB told the City about Greensun's new status on June 9, 2015.

In an email to High Society on June 11, 2014, the City stated that Par 4 had "locked down" their location for purposes of the 1,000 Foot Separation.

---

[4] The "four selected retailers" refers to the four winners of the LCB lottery.

The City then determined it would not use the timing of building permit applications for the first-in-time test. The City deemed the method inequitable because the "[v]esting of a building permit had no connection to the Washington State Liquor Control Board's program." Instead, the City decided to tie the first-in-time determinations to when the LCB issued its licenses. The City did so without engaging in formal rule-making.

On June 24, 2014, the City informed applicants that "[i]n the event two or more retail marijuana applicants seek licensing from the LCB and are located within 1000 feet of another potential retail applicant, the City shall consider the entity that is licensed first by the LCB to be the 'first-in-time' applicant." The City detailed the application process, explaining that if the LCB approves an application, the applicant will receive a payment request for a $1,000 license fee. The City said, once the LCB receives the fee, it will send a conditional approval letter that acts as a 30-day marijuana license until the applicant receives a business license with the marijuana endorsement from the Washington State Department of Revenue Business Licensing Service. The City indicated the issuance date for the 30-day license would determine which applicant had priority for the purposes of the 1,000 Foot Separation.

The City approved Greensun's marijuana license application on June 25, 2014. The application listed 10600 Main Street as Greensun's address. As with Par 4, the approval notice provided that the City "reserves all rights accorded under law to enforce violations of city ordinances and codes as exist now or as hereafter amended."

On July 1, 2014, Greensun tendered payment of its license fee to the LCB.

On July 2, 2014, High Society obtained a temporary restraining order (TRO) against the LCB. The TRO prohibited the LCB from licensing retail marijuana applicants except for the four original lottery winners. The LCB then told Greensun it could not accept its license fee payment.

The same day, an LCB employee emailed the City a copy of High Society's complaint. The City responded, "[I]it sounds like if [the LCB] issue[s] a license for a Bellevue retail store on Monday, it likely would be to Par 4 Investments (based on the status of Novelty Tree, Happy Highway, and High Society)? Can you please confirm?" The LCB indicated that the City had assumed correctly.

Par 4 paid the license fee to the LCB on July 3, 2014.

The LCB issued the first batch of marijuana retailer licenses on July 7, 2014. Par 4 received its conditional approval letter from the LCB via email at 9:17 a.m. that day. The letter sent to Par 4 was misdated July 3, 2014. Upon receiving the letter from the LCB, Par 4's attorney e-mailed it to the City. The City replied, "Consistent with my letter to your client dated June 24, 2014, [Par 4] is first in time for purposes of application of the 1,000 foot separation requirement between retail marijuana outlets." At 1:08 p.m. that same day, the LCB issued Par 4 a corrected letter with the date changed to July 7, 2014.

The initial batch of licensed applicants omitted Greensun. However, later in the day on July 7, a court lifted High Society's TRO. The LCB emailed

7

Greensun its conditional approval letter at 3:04 p.m. on July 7. The LCB then issued an updated list of the retail marijuana licenses to include Greensun. After the LCB added Greensun to the list, counsel for Par 4 emailed the City asking if this affected its first-in-time status. The City responded it did not.

At 4:19 p.m. on July 7, Greensun received an email with a letter from the City attached. The letter provided that the City had deemed Par 4 first-in-time. Accordingly, the City told Greensun it may not open a marijuana retail store at 10600 Main Street. Greensun claimed the City incorrectly deemed Par 4 to be first-in-time because the LCB issued the conditional license dated July 3, 2014 in error.

The City then engaged in the following inquiries: Chad Barnes, an Assistant City Attorney for the City, contacted Assistant Attorney General Kim O'Neal, who represented the LCB. He did so "to better understand the timing of the conditional approval letters issued by the LCB." O'Neal informed the City "that the LCB currently takes the position that the July 3, 2014 letter received by [Par 4] was not the actual marijuana retail license." O'Neal clarified that "that the actual licenses were issued following the July 7, 2014 online notice." When asked if the LCB could determine which applicant it had licensed first, O'Neal "indicated that their system was not set up for such a query."

On July 11, 2014, the City sent letters to Par 4 and Greensun asking them to provide any information that may indicate whom the LCB had licensed first.

Counsel for Par 4 responded on July 14, 2014. Par 4 noted it placed first in the LCB lottery. It said it paid the license fee on July 3, 2014 and the LCB

issued its conditional approval letter the same day. Par 4 also asserted it had received its initial conditional approval letter on the morning of July 7, 2014, and Greensun did not receive its letter until after the court lifted the TRO later in the day. Lastly, Par 4 stated it should be licensed because the City confirmed Par 4's status as first-in-time on July 7, 2014.

Greensun's attorney responded on July 21, 2014. Greensun pointed out it first applied for a building permit 18 months prior and thus had first-in-time status under the City's original method. It further contended the LCB had issued the July 3, 2014 letter to Par 4 in error because it had intended to issue all of the licenses simultaneously. Greensun argued the LCB issued both Par 4's and Greensun's licenses on July 7, 2014. Additionally, Greensun noted it "passed [its] final inspection first and [was] invoiced on July 1st prior to [Par 4]."

On July 29, 2014, the City informed Greensun via letter that it had "determined that [Par 4] was licensed by the LCB before [Greensun]. Consequently, [Par 4] is 'first-in-time' for the purposes of applying the separation requirements established in Ordinance No. 6156." The letter further explained the City's decision as follows:

> The City's decision is based on the fact that on July 3, 2014, the LCB sent [Par 4] a letter indicating it was approving [Par 4]'s marijuana retailer license and directed that the letter be posted as [Par 4]'s temporary permit. The LCB subsequently sent [Par 4] a revised temporary operating permit on July 7, 2014 at 1:08 pm.
>
> . . .
>
> The City's decision is further supported by the LCB's records that indicated [Par 4's] license was approved on July 6, 2014. [Greensun's] license was not approved until July 7, 2014.

9

. . .

The City will not grant [Greensun] a business license to operate a retail marijuana outlet at 10600 Main Street based on the separation requirement in Ordinance 6156.

The next day, July 30, 2014, the City's legal planner and assistant attorney emailed other city employees and directed them not to approve Greensun's license.

Par 4 opened its retail marijuana store on October 7, 2014.

B. Procedural History

Greensun filed a complaint against the City on November 3, 2014. The complaint alleged the City had violated the due process and privileges and immunities clauses of the Washington State Constitution and sought declaratory and injunctive relief. In the complaint, Greensun claimed it "would have been able to open its retail store in less than a week of [the LCB's] issuance of its license on July 7, if the City of Bellevue had issued its requested business license."

On May 20, 2015, the trial court granted summary judgment in favor of the City and dismissed Greensun's suit. The trial court ruled the City did not act in an arbitrary and capricious manner in denying Greensun a business license. Greensun appealed to this court.

On August 3, 2015, during the pendency of the first appeal, the Bellevue City Council engaged in formal rulemaking and passed Ordinance 6253 to legislatively adopt its first-in-time rule. The ordinance specified as follows:

10

If two or more marijuana retail applicants seek licensing from the state and propose to locate within 1,000 feet of each other, the City shall consider the entity who is licensed first by the state liquor and cannabis board to be the "first-in-time" applicant who is entitled to site the retail use. First-in-time determinations will be based on the date and time of the state-issued license or conditional license, whichever is issued first.

On June 13, 2016, this court reversed the trial court's summary judgment order. City of Bellevue v. Greensun Group, LLC, No. 73646-9-I (Wash. Ct. App. June 13, 2016) (unpublished) https://www.courts.wa.gov/opinions/pdf/736469.pdf (Greensun I). The decision invalidated the first-in-time rule and related decisions because the City adopted the rule without engaging in rule-making procedures. Greensun I, No.73646-9-I, slip op.at 15-17. This court remanded "for further proceedings consistent with" the opinion from the first appeal. Greensun I, No.73646-9-I, slip op. at 18. Our Supreme Court denied the City's petition for review.

On February 14, 2017, Greensun moved for leave to amend its complaint. Greensun sought to "add a claim for monetary damages caused by the City of Bellevue's tortious interference with its business expectancy." The trial court granted Greensun's motion. Greensun filed its amended complaint on February 28, 2017.

The parties filed cross-motions for summary judgment. Greensun sought partial summary judgment on the issue of liability with respect to its claim for tortious interference. The City asked the court to dismiss Greensun's suit and to grant declaratory relief confirming it remedied the rule-making issue. On

November 2, 2017, the court denied Greensun's motion, granted the City's motion, and dismissed Greensun's claims[5] with prejudice.

Greensun appeals.

## II.
## ANALYSIS

Greensun claims the trial court erred by entering summary judgment for the City and denying its motion for partial summary judgment. Greensun asserts that, as a matter of law, it establishes liability for its tortious interference with business expectancy claim. The City counters that Greensun fails to raise a material issue of fact as to any of the claim's elements.

Appellate courts review de novo a trial court's grant of summary judgment. Woods View II, LLC v. Kitsap County, 188 Wn. App. 1, 18, 352 P.3d 807 (2015). We will affirm a summary judgment order only "if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Woods View II, LLC, 188 Wn. App. at 18. Reviewing courts conduct the same inquiry as the trial court and view all facts and their reasonable inferences in the light most favorable to the nonmoving party. Pac. Nw. Shooting Park Ass'n v. City of Sequim, 158 Wn.2d 342, 350, 144 P.3d 276 (2006).

A plaintiff must prove five elements[6] to establish a prima face case of tortious interference with a business expectancy. Pac. Nw. Shooting Park Ass'n,

---

[5] Though the summary judgment motions and order focused on Greensun's tortious interference claim, the City also asked the court to dismiss any remaining constitutional claims and Greensun's request for declaratory relief if the court chose to revisit those claims after the first appeal. Greensun's current appeal concerns only its claim for tortious interference.

[6] More recently, our Supreme Court listed three elements for a prima face case of tortious interference. See Elcon Const., Inc. v. E. Wash. Univ., 174 Wn.2d 157, 168, 273 P.3d 965 (2012) ("A claim of intentional interference requires (1) the existence of a valid contractual relationship of which the defendant has knowledge, (2) intentional interference with an improper motive or by

158 Wn.2d at 351. Specifically, a plaintiff must show "(1) the existence of a . . . [valid] business expectancy; (2) that [the defendant] had knowledge of that [expectancy]; (3) an intentional interference inducing or causing . . . termination of the . . . expectancy; (4) that [the defendant] interfered for an improper purpose or used improper means; and (5) resultant damage." Pac. Nw. Shooting Park Ass'n, 158 Wn.2d at 351. If a plaintiff establishes all five elements, the defendant may demonstrate a privilege protecting its actions. Commodore v. Univ. Mech. Contractors, Inc., 120 Wn.2d 120, 137, 839 P.2d 314 (1992). We address each element in turn.

A. Existence of a Business Expectancy

Greensun claims it "had a valid business expectancy in operating a retail marijuana store." The City asserts Greensun fails to prove this element because (1) the company did not identify a third party with which it would have had a business relationship had it opened its store; and (2) it did not have a right to open its store in violation of the City's LUC. We conclude Greensun raises a genuine issue of material fact as to this element.

To establish a valid business expectancy, courts require something less than an enforceable contract. Scymanski v. Dufault, 80 Wn.2d 77, 83, 491 P.2d 1050 (1971). Instead, a "valid business expectancy includes any prospective contractual or business relationship that would be of pecuniary value." Newton Ins. Agency & Brokerage, Inc. v. Caledonian Ins. Group, Inc., 114 Wn. App. 151,

---

improper means that causes breach or termination of the contractual relationship, and (3) resultant damage."). Because the tests contain essentially the same elements, we apply the five-element test, as do the parties.

158, 52 P.3d 30 (2002). Courts allow tortious interference claims "where a defendant's acts destroy a plaintiff's opportunity to obtain *prospective* customers." Caruso v. Local Union No. 690, 33 Wn. App. 201, 207, 653 P.2d 638 (1982), rev'd on other grounds, 100 Wn.2d 343, 670 P.2d 240 (1983). Washington courts require a plaintiff to show only that its "future business opportunities are a reasonable expectation and not merely wishful thinking." Life Designs Ranch, Inc. v. Sommer, 191 Wn. App. 320, 337, 364 P.3d 129 (2015) (internal quotations and citations omitted); Woods View II, LLC, 188 Wn. App. at 30 (determining the plaintiff had an expectancy in a business development project that ultimately failed).

Greensun established that after Washington passed I-502, it leased a retail space in Bellevue in order to open a recreational marijuana store. Greensun made improvements to the store to prepare it for such use. Furthermore, the LCB issued Greensun a marijuana retailer license. The company made arrangements to acquire inventory and had staff available to begin operations. Greensun's plan to open a marijuana retail shop was not merely wishful thinking. It demonstrated a material issue as to its valid business expectancy.

The City's arguments to the contrary do not persuade us. The City cites Pac. Nw. Shooting Park Ass'n to argue a claim of tortious interference with a business expectancy requires the plaintiff to show a relationship with identifiable

third parties.[7] But this argument appears to conflate the claim at issue with the closely related tort of interference with a contractual relationship. The Pac. Nw. Shooting Park Ass'n case concerned whether the plaintiff had a valid contractual relationship, rather than a valid business expectancy. Pac. Nw. Shooting Park Ass'n, 158 Wn.2d at 352-53. As Greensun alleges interference with a valid business expectancy, the case is inapposite here.

The City also argues Greensun did not have a valid business expectancy because opening its store would have violated the LUC. But this argument dodges the underlying question of whether the City engaged in actionable conduct, which led to the first-in-time determinations at issue; and these determinations led to the City's denial of a license to Greensun based on the LUC.[8]

Furthermore, the City does not cite legal authority to support its claim that a plaintiff must demonstrate an enforceable legal right to meet the first element. And case law runs contrary to such a claim. See, e.g., Scymanski, 80 Wn.2d 77

---

[7] The City also cites two Division III cases, Hudson v. City of Wenatchee, 94 Wn. App. 990, 974 P.2d 342 (1999) and Evergreen Moneysource Mortg. Co v. Shannon, 167 Wn. App. 242, 274 P.3d 375 (2012), to support this proposition. We do not read Hudson to go so far as to require a plaintiff to prove it would have had a relationship with a specific prospective customer but for the defendant's interference. To be sure, such a requirement would conflict with well-established case law, which allows tortious interference claims for interference with *prospective* contractual or business relationships. See Scymanski, 80 Wn.2d at 83; Life Designs Ranch, Inc., 191 Wn. App. 320 at 337; Caruso, 33 Wn. App. at 207. Likewise, Evergreen does not apply. In that case, the plaintiff claimed the defendants improperly diverted its customers. 167 Wn. App. at 259. The court found the plaintiff did not have an expectancy because it could not demonstrate the defendant took any customers from it. 167 Wn. App. at 259.

[8] Also, the parties dispute whether Greensun's store would have violated the LUC's 1,000 Foot Separation requirement. While neither party disputes that the store locations were within 1,000 feet of one another, they dispute when a violation of the 1,000 Foot Separation requirement would occur: (1) when the City licensed two applicants with proposed locations within 1,000 feet of each other; or (2) when two marijuana shops actually opened within 1,000 feet.

at 82-83 (allowing a tort action for wrongful interference where the contract interfered with was not enforceable because it violated the statute of frauds).

In light of the foregoing, Greensun has presented sufficient evidence to raise a genuine issue as to whether it had a reasonable expectation of opening a recreational marijuana business at 10600 Main Street.

B. Knowledge of the Expectancy

The parties next dispute whether the City had knowledge of Greensun's business expectancy. We determine Greensun raises a genuine issue of material fact as to this element.

The second element of a tortious interference claim requires the defendant to have known of the plaintiff's business expectancy. Pac. Nw. Shooting Park Ass'n, 158 Wn.2d at 351. This element requires only that the defendant knew of facts giving rise to the presence of the business expectancy. Calbom v. Knudtzon, 65 Wn.2d 157, 165, 396 P.2d 148 (1964). The facts need merely show the defendant had "awareness of 'some kind of business arrangement.'" Woods View II, LLC, 188 Wn. App. at 30-31 (citing Topline Equip., Inc. v. Stan Witty Land, Inc., 31 Wn. App. 86, 93, 639 P.2d 825 (1982)) (finding the second element satisfied where the county knew of the plaintiff's business plans despite the later failing of those plans).

The City knew Greensun hoped to open a recreational marijuana shop in Bellevue. Greensun applied to the City for a building permit. The City knew the LCB lottery selected Greensun as one of the four lottery winners and it approved the intended location in the company's business license application. Greensun

16

spoke with the City about the 1,000 Foot Separation on several occasions and the City asked it to submit evidence regarding which applicant was first-in-time.

The City asserts Greensun did not allege sufficient facts "as a matter of law to establish that the City knew its actions would terminate any identifiable relationship Greensun may have had." This, however, misstates the test. A defendant needs only to be aware of facts that suggest an expectancy existed, and "[i]t is not necessary that the [defendant] understand the legal significance of such facts." Calbom, 65 Wn.2d at 165. That the City knew of Greensun's plans to open a store suffices to raise a genuine issue of material fact as to whether the City knew of Greensun's expectancy.

C. Intentional Interference Inducing or Causing a Breach or Termination of the Expectancy

Greensun asserts it meets the third element because the City intentionally denied its business license. The City responds by contending the "good faith effort to enforce its LUC does not constitute intentional and improper interference." But the analysis of intentional interference does not consider good faith. We decide that Greensun raises a genuine issue of material fact as to the element of intentional interference.

A party intentionally interferes with a business expectancy if it "desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result of his action." Newton Ins. Agency & Brokerage, Inc., 114 Wn. App. at 158.

On July 7, 2014, the City notified Greensun that Par 4 had first-in-time status and that Greensun could not open its retail marijuana store at 10600 Main Street. In a letter dated July 29, 2014, the City told Greensun, "The City will not grant [Greensun] a business license to operate a retail marijuana outlet at 10600 Main Street based on the separation requirement in Ordinance 6156." After the City determined it would not grant Greensun a license, the City's legal planner and assistant attorney emailed other City employees, telling them not to approve Greensun's license.

The City does not dispute that its actions interfered with Greensun's ability to open a retail marijuana store. Rather, the City argues it did not intentionally interfere because it acted in good faith. Whether the City acted in good faith, however, does not matter under this element,[9] which concerns only whether the defendant had the intent to do the interfering act. Accordingly, viewing the facts in a light most favorable to the Greensun, a genuine issue exists as to the third element.

D. Interfered with Improper Means

Greensun claims the City acted with improper means by acting in an arbitrary and capricious manner. The City denies this. In Greensun I, we "decline[d] to address the more troubling claim by Greensun that the questionable first in time decision here constitutes arbitrary and capricious action by the City." No.73646-9-I, slip op. at 17, n.13. We reach the question here. We conclude Greensun has presented sufficient evidence of arbitrary and

---

[9] However, as discussed below, good faith conduct can support an affirmative defense.

18

capricious conduct to raise a genuine issue of material fact as to improper means.[10]

A claim for tortious interference can be established by demonstrating the defendant acted with improper motive, improper means, or both. Pleas v. City of Seattle, 112 Wn.2d 794, 804-05, 774 P.2d 1158 (1989). Here, Greensun alleges only improper means.

Tortious interference through improper means "arises from . . . the defendant's . . . use of wrongful means that in fact cause injury to plaintiff's contractual or business relationships." Pleas, 112 Wn.2d at 803-04. To show improper means, the plaintiff must demonstrate the defendant had a duty not to interfere. Pleas, 112 Wn.2d at 804. To establish such a duty, the plaintiff may point to a statute, regulation, recognized common law, or established standard of trade or profession. Libera v. City of Port Angeles, 178 Wn. App. 669, 676-77, 316 P.3d 1064 (2013) (citing Pleas, 112 Wn.2d at 804).

When determining whether a party acted with improper means, courts analyze the method by which the defendant interfered with the expectancy. Wash. Trucking Ass'n v. Emp't Sec. Dep't, 192 Wn. App. 621, 651, 369 P.3d 170 (2016), rev'd on other grounds, 188 Wn.2d 198, 393 P.3d 761 (2017). Courts can consider a city's arbitrary and capricious actions as evidence of improper means. Pleas, 112 Wn.2d at 805. "A court need not find that a defendant acted

---

[10] In light of this conclusion, we do not reach the question whether the City's failure to engage in formal rule-making constituted improper means.

with ill will, spite, defamation, fraud, force, or coercion in order to find improper purpose or means." Libera, 178 Wn. App. at 677.

The City does not dispute that arbitrary and capricious conduct can serve as evidence of improper means. Instead, it argues it did not act in such a manner. Such conduct is defined as follows:

> Arbitrary and capricious refers to willful and unreasoning action, taken without regard to or consideration of the facts and circumstances surrounding the action. Where there is room for two opinions, an action taken after due consideration is not arbitrary and capricious even though a reviewing court may believe it to be erroneous.

Singh v. Covington Water Dist., 190 Wn. App. 416, 424, 359 P.3d 947 (2015) (internal quotations and citations omitted).

In March 2014, the City decided to implement the 1,000 Foot Separation by creating a first-in-time rule. Throughout May, the City told applicants it would make the first-in-time determination based on which applicant first applied for a building permit. When Greensun informed the City it had submitted a complete application, a City employee stated the applicant first had to be designated as a lottery winner by the LCB. As early as June 11, 2014, the City stated Par 4 was first-in-time.

Roughly two weeks before the LCB issued the licenses, the City changed course and defined the first-in-time applicant as the one who first received a license from the LCB. The City decided on this method even though the LCB stated in April that it expected to issue licenses in batches. The City adhered to

this method despite the inability of the LCB system to determine which applicant it had licensed first. As this court noted in Greensun I:

> The City's failure to notice the LCB's public announcement that "initial retail licenses will issued [sic] in batches (10-20) in most populous areas" (included Par 4 and Greensun) triggered a series of ad hoc City decisions intended to implement its unworkable first in time rule. As Drews later described it, "we did not issue a written policy about [the "lock down" rule]. We didn't publish it. We had to make decisions on the fly and—Well, that's probably not a good way to say it." The City's assistant attorney acknowledged licenses were issued in batches and the LCB's system was not set up to "determine which entity was actually first in time." Even the ultimate first in time winner, Par 4, complained to the City about its "illogical first in time rule":
>
> > The City's pursuit and reliance on the State's actual license 'issuance order' is illogical and a waste of time for all parties involved where those records likely do not exist.

No.73646-9-I, slip op. at 15, n. 11 (internal citations omitted).

Moreover, although the LCB first issued Par 4 a license dated July 3, 2014, it told the City the license was not the actual marijuana retail license. The LCB confirmed it issued all of the licenses on July 7, 2014. Notwithstanding this information from the LCB, the City justified its determination that Par 4 was first-in-time "based on the fact that on July 3, 2014, the LCB sent [Par 4] a letter indicated it was approving [Par 4]'s marijuana retailer license." The City went on to say its "decision is further supported by the LCB's records that indicated [Par 4]'s license was approved on July 6, 2014." Both of these dates were incorrect as the LCB told the City it did not issue any licenses before July 7, 2014.

Viewing the evidence in the light most favorable to Greensun, there remains a genuine issue of material fact as to whether the City acted with improper means through arbitrary and capricious conduct.

E. Resultant Damage

The parties dispute whether the City's actions caused Greensun damages. The City argues Greensun cannot demonstrate it suffered damages and cannot prove the City proximately caused any such damages. We disagree.

A party must prove a claim of damages with reasonable certainty. Mut. of Enumclaw Ins. Co. v. Gregg Roofing, Inc., 178 Wn. App. 702, 315 P.3d 1143 (2013). Thus, the party must produce evidence sufficient to support its claim. Mut. of Enumclaw Ins. Co., 178 Wn. App. at 715-16. "Evidence of damage is sufficient if it affords a reasonable basis for estimating loss and does not subject the trier of fact to mere speculation or conjecture." Mut. of Enumclaw Ins. Co., 178 Wn. App. at 716.

Though Greensun asks to have a trial to determine the exact amount of its damages, it has produced sufficient evidence that it suffered damages when it could not open a recreational marijuana store. Greensun alleged it would have opened its store but for the City's refusal to issue it a business license. It submitted evidence that it would have been able to open its store within a week of receiving its license, and therefore lost profits from that time forward. To support this claim, Greensun points to the net profits of $2,577,614 in 2015, and $3,760,535 in 2016, generated by its licensed retail store in Des Moines. Simpson contends the Des Moines store is very similar to the store Greensun

22

would have opened in Bellevue. Both spaces, he contends, are around 3,000 square feet, located on a major arterial, and have convenient customer parking. In another declaration, Simpson points to the LCB's published gross sales reported by each of its licensees. According to the LCB website, Par 4 reported $300,000 in gross sales for its first month of operation. Viewed in the light most favorable to Greensun, this evidence raises a material issue of fact as to whether the company suffered damages as a result of the City's conduct.

F. Privilege

Once a plaintiff establishes all five elements of a tortious interference claim, the burden shifts to the defendant to demonstrate the interference was justified or the actions were privileged. Pleas, 112 Wn.2d at 805. The City contends it established its actions were privileged as a matter of law. We disagree. We conclude the evidence presented raises material issues of fact.

1. Good Faith

The City first claims its actions were privileged because it based its conduct on a good faith interpretation of the zoning ordinance. Good faith may privilege an interferor's actions and thereby serve as an affirmative defense to a tortious interference claim. Moore v. Commercial Aircraft Interiors, LLC, 168 Wn. App. 502, 511-12, 278 P.3d 197 (2012) (describing good faith as an affirmative defense); see, also, Singer Credit Corp. v. Mercer Island Masonry Inc., 13 Wn. App. 877, 884, 538 P.2d 544, 549 (1975) (describing good faith as a privilege). "It [is] well established that '[o]ne who in good faith asserts a legally protected interest of his own which he believes may be impaired by the performance of a

23

proposed transaction is not guilty of tortious interference.'" Brown v. Safeway Stores, Inc., 94 Wn.2d 359, 375, 617 P.2d 704 (1980) (quoting Singer Credit Corp., 13 Wn. App. at 884). The burden of proving privilege rests with the defendant. Pleas, 112 Wn.2d at 800.

That the interferor is reasonably mistaken about the law does not defeat the privilege. See Leingang v. Pierce County Med. Bureau, Inc., 131 Wn.2d 133, 930 P.2d 288 (1997); see, also, Restatement (Second) of Torts § 773 (1979). An interferor may assert the good faith privilege based on an honest but incorrect belief. See Restatement (Second) of Torts § 773 (1979).

As to the claim that it acted arbitrarily and capriciously, the City contends it acted in good faith because it sought to enforce its zoning laws by applying the 1,000 Foot Separation through a neutral method and offered to help Greensun find another location after it denied its license. It offers the following interpretation of the 1,000 Foot Separation requirement:

> Under the City's zoning ordinances, Greensun and Par 4 became "marijuana" retailers subject to the 1,000 [sic] Separation rule at the time the LCB issued them licenses. Thus, at the time Greensun received its marijuana license from the LCB, it was in violation of the 1,000 Foot Separation because the LCB had already issued a license [sic] Par 4 for a location within 1,000 feet of the Greensun's Premises.

However, as discussed above, the City's decision to use the timing of the LCB licensing for the first-in-time determinations was questionable. The City originally implemented a system where applicants would "lock down" a location based on building permit applications. It then abandoned that to instead link the

24

first-in-time determinations to which applicant the LCB licensed first, even though the LCB stated it would issue the licenses in "batches." After the LCB informed the City that its system could not determine which applicant had been licensed first, the City asked the applicants to submit evidence as to who the LCB licensed first. This prompted even Par 4 to complain about the City's "illogical first in time rule." In Greensun I, we described the City's actions as "ad hoc" and "troubling." No.73646-9-I, slip op. at 15, n. 11, and 17, n.13.

Viewing the evidence in the light most favorable to Greensun, there is a material issue of fact as to whether the City acted in good faith. Likewise, when the evidence is viewed in the light most favorable to the City, there is a material issue of fact as to good faith. Accordingly, Greensun was not entitled to summary judgment as to liability. See C.L. v. Dep't of Soc. & Health Servs., 200 Wn. App. 189, 203-04, 402 P.3d 346 (2017). In tortious interference cases, "when there is room for different views, the determination of whether the interference was improper or not is ordinarily left to the [trier of fact]." Quadra Enters., Inc. v. R. A. Hansen Co., Inc., 35 Wn. App. 523, 527, 667 P.2d 1120 (1983) (internal quotations and citations omitted) (addressing the good faith privilege in a tortious interference claim).

2. Discretionary Immunity

Second, the City argues its actions were privileged based on discretionary immunity. When the legislature passed RCW 4.92.090, it abolished sovereign immunity. Evangelical United Brethren Church of Adna v. State, 67 Wn.2d 246, 252, 407 P.2d 440 (1965). However, courts still provide a narrow exception that

immunizes "high level discretionary acts exercised at a truly executive level." Chambers-Castanes v. King County, 100 Wn.2d 275, 281, 669 P.2d 451 (1983); Avellaneda v. State, 167 Wn. App. 474, 480, 273 P.3d 477 (2012). The immunity does not privilege ministerial or operational government acts. Taggart v. State, 118 Wn.2d 195, 214, 822 P.2d 243 (1992). Moreover, a "State [or City] is immune only if it can show that the decision was the outcome of a conscious balancing of risks and advantages." Taggart, 118 Wn.2d at 215; see, also, King v. City of Seattle, 84 Wn.2d 239, 246, 525 P.2d 228 (1974), overruled on other grounds by City of Seattle v. Blume, 134 Wn.2d 243, 947 P.2d 223 (1997) ("The fact that an employee normally engages in 'discretionary activity' is irrelevant if, in a given case, the employee did not render a considered decision."). Put another way, the immunity does not protect a city from liability for their arbitrary and capricious acts. King, 84 Wn.2d at 247. As discussed above, Greensun raises an issue of material fact as to whether the City acted in an arbitrary and capricious manner. Accordingly, the City is not entitled to summary judgment on discretionary immunity grounds.

## III.
## CONCLUSION

The trial court properly denied Greensun's summary judgment motion because issues of fact remain as to the City's liability. The trial court erred in granting the City's motion for summary judgment because Greensun has submitted evidence to raise genuine issues of fact as to the elements of a claim for tortious interference with business expectancy. We affirm in part and reverse

26

in part the order denying Greensun's motion for partial summary judgment and granting the City's summary judgment motion.[11] We remand the case for trial.

_Chun, J._

WE CONCUR:

_Andrus, P.J._

_Mann, ACJ_

---

[11] Greensun's first assignment of error provides, "The King County Superior Court erred in granting the City of Bellevue's Cross-Motion for Summary Judgment, granting the City's request for declaratory relief, and dismissing all Greensun's claims for relief." However, Greensun does not make any argument regarding the trial court's declaratory relief award in its briefing. Greensun only states the formal rule-making conducted by the City after Greensun I does not retroactively cure its tortious interference. A party abandons the assignments of error that it does not discuss in its brief. Zabka v. Bank of Am. Corp., 131 Wn. App. 167, 174, 127 P.3d 722 (2005). Because Greensun does not provide argument challenging the trial court's declaratory relief award, it abandons the issue on appeal.