IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| HOSMER HOLDINGS LLC, a Washington limited liability company, | No. 79597-0-I |
| Appellant, | DIVISION ONE |
| v. | |
| BETTY TONG and BML DEVELOP-MENT CORPORATION, a Washington corporation, | |
| Defendants, | |
| and | UNPUBLISHED OPINION |
| BAYLIS ARCHITECTS, INC., a Washington corporation, and COLLIERS INTERNATIONAL WA, LLC, a foreign limited liability company, | FILED: February 10, 2020 |
| Respondents. | |

SMITH, J. — In 2017, Hosmer Holdings LLC discovered that a commercial property it owned in Bellevue contained less square footage than Hosmer believed when it purchased the property in 2016. It sued Colliers International WA LLC, which in 2014 had provided an offering memorandum containing an incorrect square footage for the property to Oscar Pong, a Hosmer principal. It also sued Baylis Architects Inc., whose principal displayed an incorrect square footage for the property during a May 2016 meeting with Pong. Hosmer asserted claims of negligent misrepresentation and violation of the Consumer Protection Act (CPA), chapter 19.86 RCW, against both Colliers and Baylis. The trial court

summarily dismissed all claims, and Hosmer appeals.

We hold with regard to Hosmer's negligent misrepresentation claims that Hosmer failed to raise a genuine issue of material fact as to whether the square footage information provided by Colliers and Baylis proximately caused damages to Hosmer. We hold further that Hosmer failed to raise a genuine issue of material fact with regard to the injury and causation elements of its CPA claims. Therefore, we affirm.

## BACKGROUND

This case arises from the sale of a property located at 10223 NE 10th Street in Bellevue (Property), which was purchased by BML Development Corporation in 1989. In 1995, BML retained Brian Brand of Baylis Architects to design a retail building, known as the Moltissimo Building, on the Property. The Moltissimo Building was constructed between 1996 and 1997. A site plan prepared by Baylis in 1996 indicated that the Property was 29,081 square feet. Baylis did not perform any design services on the Moltissimo Building after construction was completed in 1997.

In approximately 2014, BML, through its principal, Betty Tong, began discussing marketing the Property with Colliers. Colliers and BML entered into a written listing agreement effective April 28, 2014. Colliers prepared marketing materials for the Property, including a multipage offering memorandum describing the Property. In its executive summary, the offering memorandum states, "The site is 34,001 square feet." And on its "Property Information" page, the memorandum states that the "Land Area" is "34,001 SF / 0.78 Acres per

2

KCAO." The term "KCAO" is not defined in the memorandum, but Pat Mutzel, a Colliers agent involved in marketing the Property, later explained that it stands for "King County Assessor's Office." Specifically, Mutzel declared that Tong did not give Colliers any information about the Property's dimensions; thus, Colliers used the 34,001 square footage stated on the KCAO website. The offering memorandum's table of contents page contains a disclaimer stating, in part, "Colliers International makes no guarantees, representations or warranties of any kind . . . regarding the information including, but not limited to, warranties of content, accuracy and reliability. Any interested party should undertake their own inquiries as to the accuracy of the information."

Mutzel also testified in his declaration that Colliers had engaged an architect, Carlos de la Torre, to create conceptual drawings for the marketing materials. In an April 28, 2014, email on which Mutzel was copied, de la Torre wrote, "[Mutzel]- Thanks again . . . One thing that is strange is that the King County Parcel info and Bellevue info state this as 34,001 square feet, but when I dimension it from the maps I am only getting around 28,300 or so." Mutzel later testified that because de la Torre was not a land surveyor and Mutzel did not know how de la Torre came up with that square footage, Colliers was comfortable using the figure from the KCAO website "and telling buyers where we got that information and letting them rely on their own efforts to make sure that's accurate or not."

In 2014, Mutzel met with Oscar Pong, a senior member of the Pong family, to discuss the Property. The Pong family has, through various entities,

3

purchased and redeveloped several commercial properties, and Oscar Pong has been the family member primarily responsible for selecting properties and negotiating their purchase. According to his deposition testimony, Pong began developing hotels in the 1980s and has since developed 10 to 20 commercial properties. At the 2014 meeting, Mutzel gave Pong a copy of the offering memorandum. After that meeting, Pong reviewed the memorandum but decided not to make an offer on the Property. In August 2014, BML's listing agreement with Colliers expired. Although BML allowed Colliers "to continue to market the property for a short time after expiration," Colliers' "exclusivity pretty much ended at the end of [the] 2014 calendar year."

In 2015, Pong discussed the Property with another agent, Steven Paravia of SRE Commercial, who had become involved in marketing the Property. Paravia gave Pong another copy of the Colliers offering memorandum. On May 11, 2015, Pong made an offer of $13 million for the Property on behalf of MBK LLC, a Pong family entity. According to Pong's later declaration, this offering price "was based upon approximately $382 per square foot for 34,001 square feet." BML did not accept the offer.

Pong remained interested in the Property, and Tong suggested that he meet with Brand to discuss redevelopment opportunities for the Property. Brand later recalled that Paravia asked "whether [Brand] would be willing to meet with a buyer interested in redeveloping the property" and that "the buyer had some questions about developing a high-rise building and wanted to discuss how to achieve maximum building height."

4

Brand met with Pong, Pong's son Paul, Paravia, and another broker in May 2016. Brand later explained that at the time of the May 2016 meeting, the maximum building height for the Property was 90 feet for residential use, but that an anticipated change to Bellevue's land use code would allow a residential use building on the Property to be developed up to 160 feet. At the meeting, Brand offered his opinions regarding how to maximize building height under the anticipated code change. To facilitate the discussion, Brand "typed the Moltissimo Building's address into [the] King County's Parcel Viewer website." Brand later explained that doing so allowed him to confirm the Property's location and ascertain the property's zoning designation. A pop-up window appeared with information about the Property, including its area. Brand displayed the Parcel Viewer results on a monitor for the benefit of those present at the meeting. The pop-up window indicated that the Property's area was 34,001 square feet. According to Pong, Brand "referenced the 34,001 square footage, and discussed development possibilities using that square footage." The meeting lasted about an hour. When asked at his deposition about the purpose of the meeting and whether his offering price for the Property changed after the meeting, Pong testified:

> A.  So originally the price already gone from 13 million to 15 million, and I say no more. But the seller, Betty Tong, insisted [on] $16 million. And she said that, You can build more than 90; you can go ahead and ask the architect; you can actually build to 160. That's why we had [the] meeting with Baylis Architect[s].
> And then after the meeting, I was thinking, if I can really build so tall, then I will accept the $16 million, so that's after the meeting. And this is also based on 34,000 square foot, and I can build up to 160 feet. That's why I accepted

> the $16 million.
>
> Q. Okay. Understood. So you met with Baylis Architects in May 2016 to confirm you could build to 160 feet and they said that you could; correct?
>
> A. Correct.

Pong also testified that he initially had offered $15 million. But after the meeting with Brand, Pong was convinced that the Property could be built up to 160 feet and "was okay . . . with the price of $16 million," which was BML's asking price.

On June 8, 2016, Hosmer and BML executed a Commercial & Investment Real Estate Purchase and Sale Agreement for the Property with a purchase price of $16 million, an outside closing date of September 15, 2016, and no feasibility contingency. When asked at his deposition how he arrived at the purchase price, Pong testified:

> So because I figure that the size was 34,001 square footage, it was – the price that I have in mind was $15 million. So with that, there was – it was about more than $400 per square feet, roughly $470. And the asking price was $16 million, and the seller insisted that amount of money. And at that time, because of the tax implication with the 1031 and Hosmer Holding, I was ready to sell that. That's why I decided to accept that price.

The sale of the Property from BML to Hosmer ultimately closed on December 29, 2016. It is undisputed that Hosmer did not engage in any independent effort to verify the Property's square footage before closing.

In February 2017, Hosmer retained Baylis to perform preliminary design services with regard to the Property. At that time, Brand requested a copy of a land survey, and Paravia emailed him a copy of a 2012 survey. That survey indicated that the area of the Property was 28,573 square feet. Brand notified Hosmer and encouraged it to obtain a survey to verify the size of the Property.

Hosmer did so, and the survey indicated that the Property was only 28,631 square feet in size.

In October 2017, Hosmer sued BML, Tong, and Baylis. Hosmer alleged that all three defendants had negligently misrepresented that the Property contained 34,001 square feet and that this misrepresentation proximately caused Hosmer damages. Hosmer also alleged that BML was unjustly enriched.

In May 2018, BML and Tong moved for summary judgment. After that motion was fully briefed but before it was decided, the court entered an order dismissing all claims against BML and Tong under CR 41(a)(1)(B).[1]

After BML and Tong were dismissed, Hosmer amended its complaint. In its amended complaint, Hosmer added Colliers as a defendant and alleged that both Colliers and Baylis negligently represented that the Property was 34,001 square feet. Hosmer alleged that this misrepresentation caused Hosmer damages in the amount of $2,526,986.00, which Hosmer alleged was "the difference between the sale price of the [P]roperty and its actual square footage value at the time it was sold." Hosmer also alleged that by asserting that the Property contained 34,001 square feet, Colliers and Baylis violated the CPA.

Colliers and Baylis each moved for summary judgment, and the trial court granted both motions. Hosmer appeals.

---

[1] CR 41(a)(1)(B) provides that the court shall dismiss an action "[u]pon motion of the plaintiff at any time before plaintiff rests at the conclusion of plaintiff's opening case."

## DISCUSSION

### Standard of Review and Summary Judgment Standard

We review summary judgment orders de novo. Keck v. Collins, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). "[S]ummary judgment is appropriate where there is 'no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.'" Elcon Constr., Inc. v. E. Wash. Univ., 174 Wn.2d 157, 164, 273 P.3d 965 (2012) (second alteration in original) (quoting CR 56(c)). "In a summary judgment motion, the moving party bears the initial burden of showing the absence of an issue of material fact." Young v. Key Pharm., Inc., 112 Wn.2d 216, 225, 770 P.2d 182 (1989).

If the moving party satisfies its initial burden, the burden shifts to the nonmoving party to bring forth specific facts to rebut the moving party's contentions. Elcon Constr., 174 Wn.2d at 169. "The nonmoving party may not rely on speculation, argumentative assertions, 'or in having its affidavits considered at face value; for after the moving party submits adequate affidavits, the nonmoving party must set forth specific facts that sufficiently rebut the moving party's contentions and disclose that a genuine issue as to a material fact exists.'" Becker v. Wash. State Univ., 165 Wn. App. 235, 245-46, 266 P.3d 893 (2011) (quoting Seven Gables Corp. v. MGM/UA Entm't Co., 106 Wn.2d 1, 13, 721 P.2d 1 (1986)). Although the evidence is viewed in the light most favorable to the nonmoving party, if that party is the plaintiff and he fails to make a factual showing sufficient to establish an element essential to his case, summary judgment is warranted. Young, 112 Wn.2d at 225.

Analysis

*Negligent Misrepresentation*

Hosmer argues that the trial court erred by summarily dismissing its negligent misrepresentation claims against Colliers and Baylis. We disagree.

To prevail on a claim of negligent misrepresentation, a plaintiff must prove six elements:

> (1) the defendant supplied information for the guidance of others in their business transactions that was false, (2) the defendant knew or should have known that the information was supplied to guide the plaintiff in his business transactions, (3) the defendant was negligent in obtaining or communicating the false information, (4) the plaintiff relied on the false information, (5) the plaintiff's reliance was reasonable, and (6) the false information proximately caused the plaintiff damages.

Ross v. Kirner, 162 Wn.2d 493, 499, 172 P.3d 701 (2007). All six elements must be proven "by clear, cogent, and convincing evidence." Ross, 162 Wn.2d at 499. To this end, "when reviewing a civil case in which the standard of proof is clear, cogent, and convincing evidence, this court 'must view the evidence presented through the prism of the substantive evidentiary burden.'" Woody v. Stapp, 146 Wn. App. 16, 22, 189 P.3d 807 (2008) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). Thus, in reviewing the trial court's summary judgment order, we must determine whether, viewing the evidence in the light most favorable to Hosmer, a rational trier of fact could find that Hosmer supported all elements of its negligent misrepresentation claims with clear, cogent, and convincing evidence. Woody, 146 Wn. App. at 22. We hold that a rational trier of fact could not so find.

Specifically, and as discussed, the final element of negligent

misrepresentation requires the plaintiff to establish that the false information supplied by the defendant proximately caused the plaintiff damages. Ross, 162 Wn.2d at 499. "[D]amages for negligent misrepresentation are limited to 'those necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is a legal cause.'" Janda v. Brier Realty, 97 Wn. App. 45, 50, 984 P.2d 412 (1999) (quoting RESTATEMENT (SECOND) OF TORTS § 552B (AM. LAW INST. 1977)). These include (1) "the difference between the value of what he has received in the transaction and its purchase price or other value given for it" and (2) "pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the misrepresentation." Janda, 97 Wn. App. at 50 (quoting RESTATEMENT (SECOND) OF TORTS § 552B).

Here, Hosmer asserts that it raised a genuine issue of material fact as to damages because it purchased the Property for $16 million based on $470 per square foot, and "the same price per square foot for the actual square footage results in a much lower figure." But Hosmer put forth no evidence of what the Property was actually worth when Hosmer purchased it. In other words, Hosmer failed to present any specific facts from which a jury could find, with clear, cogent, and convincing evidence, that what Hosmer received, i.e., the Property, was worth less than what Hosmer paid for it.[2]

---

[2] At oral argument, Hosmer relied for the first time on a table of recent land sales, and their per-square-foot prices, printed in the offering memorandum. But the offering memorandum was prepared in 2014, while Hosmer's purchase of the Property did not close until 2016. And Pong himself testified that "the market price in Bellevue area had upright movement . . . during 2015 to 2017" and that "during that period of time, . . . you can see the price actually go up month by month." Thus, the table does not create a genuine issue of material fact as to

Furthermore, Hosmer's entire argument regarding damages is premised on its assertion that the Property was worth less than what Hosmer paid. Accordingly, Hosmer does not point to any evidence in the record establishing that it otherwise suffered a pecuniary loss as a consequence of Colliers' and Baylis's alleged misrepresentations.[3] For these reasons, Hosmer failed to raise a genuine issue of material fact as to whether it suffered any compensable damages. See Janda, 97 Wn. App. at 51 (holding that plaintiff did not suffer any damages recoverable under a negligent misrepresentation theory where value of property received exceeded amount paid).

Additionally, even assuming that Hosmer suffered pecuniary damages, Hosmer has pointed to no facts from which a jury could find with clear, cogent, and convincing evidence that those damages were proximately caused by Colliers' or Baylis's alleged misrepresentations. Specifically, Hosmer asserts that it "would not have purchased the Property for $16 million if it knew the actual square footage," but it points to nothing in the record to support this contention. Pong did declare that "[h]ad [he] known the site was only 28,631 square feet . . . , [he] would certainly not have *offered* $16,000,000." (Emphasis added.) But just because Pong would not have *offered* $16 million does not mean he would not ultimately have *paid* $16 million. Indeed, square footage was only one of multiple considerations that Pong testified factored into his decision to offer $16 million:

---

whether Hosmer suffered damages proximately caused by Colliers' or Baylis's alleged misrepresentations.

[3] Indeed, a study prepared by Baylis in March 2017 reflects that by using an affordable housing bonus, Hosmer could achieve the same development potential on the Property even with the smaller square footage.

11

Pong testified that his decision was also based on tax implications for Hosmer and the fact that the Property could be developed up to 160 feet. Significantly, Pong also testified that his decision to offer $16 million was also based on BML's insistence on that price, and Hosmer points to nothing in the record indicating that BML would have accepted less had it known the Property's actual square footage.

In short, Hosmer failed to raise a genuine issue of material fact as to whether Colliers' and Baylis's alleged misrepresentations proximately caused any damages. Therefore, summary judgment was proper.[4] And because the damages element is a necessary element of Hosmer's negligent misrepresentation claims, we do not address the remaining elements.

*Consumer Protection Act*

Hosmer argues that the trial court erred by summarily dismissing its CPA claims against Colliers and Baylis. Again, we disagree.

"The CPA's citizen suit provision states that '[a]ny person who is injured in his or her business or property' by a violation of the act may bring a civil suit for . . . damages, attorney fees and costs, and treble damages." Panag v. Farmers Ins. Co. of Wash., 166 Wn.2d 27, 37, 204 P.3d 885 (2009) (first

---

[4] Baylis did not address the damages element below or on appeal. However, Colliers' briefing called the damages issue to the trial court's attention, the analysis of this issue is the same for Baylis as it is for Colliers, and we "may affirm on any basis supported by the record whether or not the argument was made below." Bavand v. OneWest Bank, 196 Wn. App. 813, 825, 385 P.3d 233 (2016); see also RAP 9.12 ("On review of an order granting or denying a motion for summary judgment the appellate court will consider only evidence and issues called to the attention of the trial court.").

alteration in original) (quoting RCW 19.86.090). "To prevail in a private CPA claim, the plaintiff must prove (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a person's business or property, and (5) causation." Panag, 166 Wn.2d at 37. "A plaintiff must satisfy all five elements to prevail." Indoor Billboard/Wash., Inc. v. Integra Telecom of Wash., Inc., 162 Wn.2d 59, 74, 170 P.3d 10 (2007). Here, as discussed further below, summary judgment was proper because Hosmer failed to raise a genuine issue of material fact as to the final two elements, injury and causation.

"To establish injury and causation in a CPA claim, it is not necessary to prove one was actually deceived." Panag, 166 Wn.2d at 63. "It is sufficient to establish the deceptive act or practice proximately caused injury to the plaintiff's 'business or property.'" Panag, 166 Wn.2d at 63-64. To that end, "'[i]njury' is distinct from 'damages.'" Panag, 166 Wn.2d at 58. Thus, "[m]onetary damages need not be proved, and unquantifiable damages, such as loss of goodwill, damage to professional reputation, delay, and loss of use may suffice. Panag, 166 Wn.2d at 58. As for proximate causation, "[a] plaintiff must establish that, but for the defendant's unfair or deceptive practice, the plaintiff would not have suffered an injury." Indoor Billboard, 162 Wn.2d at 84.

Here, Hosmer's entire argument with regard to injury and causation is, again, based on an alleged monetary loss. Specifically, and as discussed, Hosmer contends that the Property was worth less than what Hosmer paid and that Hosmer would not have paid $16 million for the Property had it known that it

13

was only 28,631 square feet in size. But as discussed with regard to Hosmer's negligent misrepresentation claim, Hosmer has not pointed to *any* evidence showing that (1) the Property was worth less than $16 million or (2) BML, which undisputedly insisted on that price, would have accepted anything less. And Hosmer did not point to any other alleged injury, below or on appeal, to support its CPA claims. Accordingly, Hosmer failed to raise a genuine issue of material fact as to the injury and causation elements of its CPA claims against both Colliers and Baylis.[5]

Hosmer disagrees and asserts that "[i]t does not take an expert's knowledge to determine that the same price per square foot for the actual square footage results in a much lower figure." But this assertion fails to address the fact that Hosmer presented no evidence, expert or otherwise, of the Property's actual value.

Hosmer next argues that because Colliers made a material omission by failing to disclose the possible square footage discrepancy, a genuine issue of material fact exists as to causation. Hosmer relies on Deegan v. Windermere Real Estate/Center-Isle, Inc., 197 Wn. App. 875, 391 P.3d 582 (2017), in support of its argument. In Deegan, we observed that reliance is one way to establish causation in CPA cases. 197 Wn. App. at 886. And as Hosmer correctly points out, we also held that when the defendant's unfair or deceptive act or practice

---

[5] Baylis also did not address the injury and causation elements below or on appeal. However, Colliers' briefing called these issues to the trial court's attention, and the analysis of injury and causation is the same for Baylis as it is for Colliers. Thus, we may affirm on this basis.

14

consists of an omission of a material fact, a rebuttable presumption of reliance applies. Deegan, 197 Wn. App. at 890. But Deegan is distinguishable because it was decided in the context of a CR 12(b)(6) motion, and thus the court relied on hypothetical facts consistent with the complaint to conclude that an omission of material fact had been alleged. 197 Wn. App. at 884, 890. Here, however, Hosmer points to no *specific facts*—as required in the summary judgment context—to raise a genuine issue of material fact as to whether a possible square footage discrepancy would have been material. To the contrary, the record establishes that the ability to develop up to 160 square feet and BML's insistence on its asking price were the driving factors behind Hosmer's decision to pay $16 million for the Property. Furthermore, nothing in Deegan's analysis of the *causation* element changes the fact that Hosmer failed to present any evidence of *injury*. Therefore, Deegan does not require reversal.

In short, Hosmer failed to raise a genuine issue of material fact with regard to the injury and causation elements of its CPA claims against both defendants. Thus, summary judgment was proper. And because injury and causation are necessary elements, we do not address the remaining elements of Hosmer's CPA claims.

<u>Fees on Appeal</u>

Hosmer requests an award of attorney fees under RAP 18.1 and the CPA—specifically, RCW 19.86.090. Meanwhile, Colliers requests an award of attorney fees under RAP 18.1 and RAP 18.9(a), arguing that Hosmer's appeal is frivolous. And Baylis requests costs under RAP 14.3.

Because Hosmer is not a prevailing party, we deny its request for attorney fees. See RCW 19.86.090 (authorizing award of reasonable attorney fees to prevailing parties).

As for Colliers' request for attorney fees, Colliers argues that Hosmer's appeal is frivolous because Hosmer failed to offer any evidence of damages even after Colliers, via its summary judgment motion, put Hosmer on notice that this evidence was lacking. This argument is not without merit. But we nonetheless decline to award fees to Colliers because Hosmer's appeal raised debatable issues on other elements of Hosmer's claims, including, most significantly, Colliers' own negligence in using the 34,001 square foot figure despite having been put on notice of a potential discrepancy.

Specifically, although Colliers asserts that a real estate broker's duties are limited to those set forth in chapter 18.86 RCW (Broker's Act), the case on which Colliers relies, Jackowski v. Borchelt, 174 Wn.2d 720, 278 P.3d 1100 (2012), does not stand for that proposition. Rather, in Jackowski, the court observed only that a buyer's agent's duties *to its principal* are, unless otherwise agreed, limited to those set forth in the Broker's Act. 174 Wn.2d at 732; see also RCW 18.86.110 (providing that "[t]his chapter supersedes the fiduciary duties *of an agent to a principal* under the common law" and "[t]he common law *continues to apply to the parties in all other respects*" (emphasis added)). Thus, contrary to Colliers' assertions, Hosmer did not need to establish that Colliers, which was not Hosmer's agent, violated the Broker's Act to raise a genuine issue of material fact as to Colliers' negligence.

16

To that end, Hosmer filed an expert declaration that established a genuine issue of material fact as to whether Colliers was negligent when it stated in the offering memorandum that the Property was 34,001 square feet.[6] Specifically, E.J. Bowlds, a licensed real estate managing broker, opined that "[b]ecause of the de la Torre email, Colliers and Mr. Mutzel knew or could have known with the exercise of reasonable care about the square footage issue, and were therefore acting contrary to law when they published and distributed the erroneous square footage of the parcel." Although Bowlds's declaration contains legal conclusions in that Bowlds asserts that Colliers violated certain statutes, we presume that the trial court ignored those conclusions. See Orion Corp. v. State, 103 Wn.2d 441, 462, 693 P.2d 1369 (1985) (on summary judgment, court is presumed to ignore improper legal conclusions contained in expert affidavit). And even after those conclusions are disregarded, Bowlds's declaration, when viewed in the light most favorable to Hosmer, establishes that a reasonable broker in Mutzel's circumstances would not have used the 34,001 square foot figure in the offering memorandum, even with a disclaimer, after receiving de la Torre's email.

In short, because Hosmer's appeal raised debatable issues on elements other than those on which we rely to affirm the trial court, we deny Colliers' request for fees on appeal. See In re Recall of Feetham, 149 Wn.2d 860, 872,

---

[6] Colliers points out, with regard to the falsity element of Hosmer's negligent misrepresentation claim, that the offering memorandum states, "Land Area: 34,001 SF / 0.78 Acres per KCAO." (Emphasis added.) It argues that because the KCAO website does in fact state that the Property is 34,001 square feet, Colliers did not supply false information. But this argument is unpersuasive because another part of the offering memorandum states, without qualification, that "[t]he site is 34,001 square feet."

72 P.3d 741 (2003) ("An appeal . . . is frivolous if there are '*no debatable issues upon which reasonable minds might differ*, and it is so totally devoid of merit that there was no reasonable possibility' of success." (emphasis added) (internal quotation marks omitted) (quoting <u>Millers Cas. Ins. Co. of Tex. v. Briggs</u>, 100 Wn.2d 9, 15, 665 P.2d 887 (1983))).

As a final matter, any request for costs, including statutory fees, should be directed to a commissioner or court clerk as provided in Title 14 RAP.

We affirm.

WE CONCUR: